In re OPPEGARD AGENCY,
INC., Debtor.

Rudell M. OPPEGARD, Plaintiff,

v.

Arnold K. SKEIE, Defendant.

Arnold K. SKEIE, Counterclaimant,

v.

Rudell M. OPPEGARD, Lowell Moen,
Gordon Dobberstein, William Roeszler,
Oppegard Agency, Inc., and Gary State
Bank, Counterclaim Defendants.

Bankruptcy No. 6–92–266.
Adv. No. 6–92–16.

United States Bankruptcy Court,
D. Minnesota.

March 26, 1993.

Daniel Beck, St. Paul, MN, for Arnold Skeie, defendant.

Susan E. Barnes, Minneapolis, MN, for Lowell Moen, Gordon Dobberstein, William Roeszler, counterclaim defendants.

David T. DeMars, Fargo, ND, for Oppegard Agency, Inc., counterclaim defendant.

Roseanne Wirth, Lindquist & Vennum, Minneapolis, MN, for debtor.

### ORDER

DENNIS D. O'BRIEN, Bankruptcy Judge.

This adversary proceeding was tried, beginning on January 4, 1993. Appearances are noted in the record. At conclusion of the trial, on January 8, 1993, the Court invited final briefs from the parties. All materials have been submitted. The Court, having heard and received testimony and documentary evidence, having reviewed and considered the briefs submitted, and being fully advised in the matter, now makes this **ORDER** pursuant to the Federal and Local Rules of Bankruptcy Procedure.

## I.

### An Overview.

On July 9, 1990, Rudell Oppegard caused his closely held bank holding company, Oppegard Agency, Inc., to issue to him a large block of Agency shares for no consideration. The issue was the centerpiece of a recapitalization of the Agency that also involved the issue of shares to Lowell Moen, Gordon Dobberstein, and William Roeszler for $10.00 per share. Oppegard's pre-existing Agency shares were in the possession of American National Bank of St. Paul and its assignees to secure payment of defaulted notes of more than $500,000. The July 9, 1990, issue to Mr. Oppegard was intended to facilitate his continued control of the Agency by diluting or destroying the value of his pre-existing shares. The issue to Mr. Dobberstein, Mr. Moen and Mr. Roeszler was made to provide for a direct capital infusion into the American State Bank of Erskine, one of two banks owned by the Agency.

On July 20, 1990, Arnold Skeie, without knowledge of the July 9 Agency stock issue, acquired, by assignment, the rights to the American National Bank notes and Mr. Oppegard's Agency shares securing them. On December 31, 1991, the shares that had been issued by the Agency to Oppegard on July 9, 1990, for no consideration, were cancelled pursuant to order of the Federal Reserve System through the Federal Reserve Bank of Minneapolis.

In this adversary proceeding, Mr. Skeie seeks judgment cancelling all Agency shares issued on July 9, 1990, claiming that the entire issue was the result of a fraudulent conspiracy to destroy the value of his collateral.[1] In the alternative, Mr. Skeie seeks an equitable redistribution of existing outstanding shares among Mr. Skeie, Mr. Dobberstein, Mr. Moen and Mr. Roesz-

---

1. The litigation was originally commenced in state district court by Mr. Oppegard against Mr. Skeie. Mr. Oppegard sought judgment entitling him to return of the pledged shares, free of the American National Bank security interest. The case was removed upon the filing of the Agency for relief under 11 U.S.C. Chapter 11. Mr. Oppegard agreed to dismissal of his complaint prior to trial, and the matter was heard on Mr. Skeie's counterclaim. Mr. Oppegard did not appear at trial.

ler to prevent alleged unjust enrichment of the Counterclaim Defendants.

The Agency, Mr. Dobberstein, Mr. Moen and Mr. Roeszler deny both individual and conspiratorial fraud. Additionally, they allege that Mr. Skeie lacks standing to seek the relief requested, and the Counterclaim Defendants have moved for dismissal on that ground.

## II.

### Rudell Oppegard, Arnold Skeie, and The Chase.

*Mr. Oppegard.*

Rudell Oppegard was a rural banker, a farmer, and a real estate investor. He was a partner in a large farming operation near Perham, Minnesota; owned a restaurant in Wyoming; and, held an interest in a real estate partnership in Arizona. At the center of Mr. Oppegard's financial world was the Oppegard Agency. The Agency was a bank holding company that at one time controlled four banks in rural Minnesota. Mr. Oppegard owned 92% of the Agency, 7,431.08 out of 8,000 outstanding shares. Various family members held the balance.

The 1980s were not good years for Mr. Oppegard, financially. The trouble started with the farm, but eventually spread throughout his entire portfolio. Mr. Oppegard borrowed $460,000 from American National Bank in 1986 for a milk producing plant operated in conjunction with the farm, giving American National a security interest in all of his Agency stock as collateral for the loan. Both the plant and the farm failed and were subsequently lost. Mr. Oppegard later said that he lost $2,000,000 on the investment.

The Agency did not fare well either. In 1987, one of the four banks was sold to pay Mr. Oppegard's personal and corporate debt to Norwest Bank, and another bank was closed by the FDIC. By 1988, the Agency was left with two significant assets, the American State Bank of Erskine and the Twin Valley State Bank. The Agency, which was under the regulatory supervision of the Federal Reserve System, was subject to a cease and desist order prohibiting it from incurring additional debt without Federal Reserve approval. Although the Twin Valley Bank was relatively healthy, the Erskine Bank was in serious trouble.

Mr. Oppegard's equity in his real estate investments was lost as well. The Wyoming property was sold in 1987, and the proceeds were injected by Mr. Oppegard into the bank that was eventually closed by the FDIC. His Arizona investment was committed to the failed bank that year as well.

In March 1987, American National Bank obtained a judgment against Mr. Oppegard on its note in the amount of $507,382. When the judgment was not paid, American National requested and received from Mr. Oppegard, the pledged shares and a signed stock power authorizing transfer of the shares to American on March 23, 1988.

Mr. Oppegard would make his last stand to save the remnants of his portfolio by doing everything within his power to get his stock back and to protect his interest in the Agency. Being so driven, he was not pleased to learn that on May 9 and 10, 1988, American National Bank had entered a contingent agreement to sell the pledged Agency shares to Arnold Skeie for $340,-000.

*Mr. Skeie.*

Arnold Skeie is a former Control Data executive. In 1976, Mr. Skeie acquired an 80% interest in Financial Services of Winger, Inc., which is a bank holding company that owns and controls the Farmer's State Bank of Winger, Winger, Minnesota. Twin Valley, Erskine, and Winger are in the same general geographic area in Minnesota. In March 1988, Mr. Skeie received a letter from American National Bank soliciting a bid from him for Mr. Oppegard's pledged shares in the Oppegard Agency.

Mr. Skeie initially became interested in purchasing the shares for two reasons. One was that he believed that the long-term interests, and perhaps survival, of the Farmer's State Bank of Winger would be best secured by its merger with another bank. The other was that Twin Valley

Bank, due to its proximity to Winger and apparent relatively healthy condition, was an excellent candidate for merger.

Mr. Skeie ultimately entered an agreement with American National Bank for purchase of Mr. Oppegard's pledged shares at $340,000. The agreement, finalized on May 9 and 10, 1988, was contingent upon Mr. Skeie's receiving the necessary regulatory approval through the Federal Reserve Bank in Minneapolis.[2] Mr. Skeie thereupon embarked upon an odyssey, seemingly driven by obsession at times, in quest of the necessary regulatory approval that has eluded him to this day.

*The Chase.*

Between June 1988 and December 1990, Mr. Skeie approached the Federal Reserve at least seven times with proposals to support a change in control of the Oppegard Agency in hope of obtaining the necessary regulatory approval that would enable him to take control of the Agency. His proposals were rebuffed each time. Mr. Skeie blames Mr. Oppegard for his problems in securing approval for change in control, claiming that he denied Mr. Skeie access to important information and otherwise obstructed his efforts. Mr. Oppegard certainly was not helpful. Yet, it was the failure of Mr. Skeie's proposals to satisfactorily address known conditions of the Agency and its banks, and concerns of the Federal Reserve Bank regarding Mr. Skeie and the Winger Bank, that resulted in his failure to obtain approval.

While Mr. Skeie was seeking regulatory approval for change in control of the Oppegard Agency to enable him to complete purchase of the Oppegard pledged shares, Mr. Oppegard was seeking an investment solution that would enable him to get his shares back from American National Bank. He was having difficulty. Mr. Oppegard had no funds to negotiate a buy back of his pledged shares from American, and he could not convince any potential investors to participate in a structured deal that would leave him in control of the Agency.

The single greatest obstacle to both Mr. Skeie's and Mr. Oppegard's efforts was the condition of the Erskine Bank. The Federal Reserve made clear from the outset that no change in control would be approved that did not provide for an immediate substantial capital infusion into the Erskine Bank. Further, the capital infusion could not result in any increase in debt of either the Agency or its banks. In other words, the infusion must be by investment, not loans. Mr. Skeie was unwilling to invest risk capital in the Agency for the benefit of the Erskine Bank. He was not interested in the Erskine Bank. His only interest in the Agency was to pluck it of the Twin Valley Bank.[3]

Likewise, Mr. Oppegard was unable or unwilling to come up with a plan that successfully addressed the Erskine Bank. By May 1989, conditions at the Erskine Bank had deteriorated to the extent that the FDIC, which insured its deposits, issued a cease and desist order requiring it to increase its equity capital by not less than $550,000. Mr. Oppegard was unable to focus the harsh reality of the financial condition of the Agency, even in light of the FDIC order.

On November 27, 1989, the Counterclaim Defendants and others offered to invest a total of $600,000 in the Agency in return for 60% ownership.[4] The funds could have

2. The federal Bank Holding Company Act requires that a party seeking to obtain more than 25% controlling interest in a bank holding company obtain regulatory approval. Because the pledged shares represented 92% of the outstanding shares of the Agency, regulatory approval for the transfer and ownership of the shares was required.

3. It is clear from the responses of the Federal Reserve Bank to the various proposals submitted by Mr. Skeie for change in control of the Agency, that no approval would be given to a proposal that would separate the Erskine Bank from the controlling authority of the Twin Valley Bank unless the Erskine Bank would be made financially sound in the transaction.

4. Those involved in the offer were officers and directors of the Gary State Bank, sometimes referred to in the litigation as the "Gary Group." Mr. Dobberstein testified that the group became interested in the investment upon learning from local newspapers that shares were being sold. Apparently, this is in reference to legal notices published by Mr. Skeie in connection with his efforts to obtain change in control with respect to the pledged shares.

been downstreamed into the Erskine Bank. Mr. Oppegard declined the offer because he wished to retain the controlling interest in the Agency.

Finally, in March 1990, Mr. Oppegard contacted Counterclaim Defendants Dobberstein and Moen separately regarding investment proposals. He asked Mr. Dobberstein for a $100,000 investment. Of that amount, $75,000 was to be deposited in trust for the later issue of shares in the Agency. The other $25,000 was to be an unsecured loan that would be used to pay down Agency debt. The loan would be repaid with the later issue of Agency shares.

Mr. Moen was asked for a loan of $100,000 that would be used in part by Mr. Oppegard to purchase back his pledged shares from American National Bank. The loan would be secured by the pledged shares to be repurchased. Mr. Moen was asked to commit to an investment of an additional $100,000 for which he would be issued new Agency shares as part of recapitalizing the Agency once the shares pledged to American National had been reacquired by Mr. Oppegard.

Each Counterclaim Defendant, without knowledge of the other's involvement, accepted the proposal. Although testimony of these gentlemen, particularly Mr. Moen, is somewhat confusing, their individual understanding and intentions regarding the transaction seemed to be that each would be injecting $100,000 into the Agency in return for new shares that each believed would represent 10% of the total outstanding shares of the recapitalized Agency. The investment was to provide capital for the Erskine Bank. That understanding is consistent with what Mr. Oppegard's plan apparently was at the time.

Mr. Oppegard hoped to raise $200,000, invested by Mr. Dobberstein and Mr. Moen, to be supplemented by a $100,000 dividend from Twin Valley Bank, the approval for which was sought from the Minnesota Commerce Commissioner by letter of March 20, 1990.[5] The dividend along with the new investments, plus a portion of the funds borrowed from Mr. Moen, would provide more than $300,000 additional capital for the Erskine Bank.

With the Dobberstein and Moen investment/loan commitments secured, Mr. Oppegard contacted his long-time friend Lloyd Amundson to help him get his pledged shares back from American National Bank. Mr. Amundson is an established and respected rural banker. Together, the two met with officials of American on April 4, 1990. American National had expressed a willingness to explore resolution of the matter, in part due to the inability of Mr. Skeie to get the necessary regulatory approval to consummate the earlier purchase agreement, and, in part due to regulatory pressures of its own.

Mr. Amundson negotiated with American National for Mr. Oppegard's repurchase of the pledged shares and, according to him, a deal was struck for Mr. Oppegard to buy back the shares for $65,000 cash. The deal was sealed with a handshake. Apparently, the bond was not very strong because on April 10, 1990, American National assigned its interest in the Oppegard notes, security agreement and pledged shares to the Farmer's State Bank of Winger, at the request of Mr. Skeie, for $115,000.

The chase appeared to be over, with Mr. Skeie the winner. Farmer's State Bank of Winger now owned the notes and the security agreement, and seemingly had the rights to the pledged Oppegard shares. But Mr. Oppegard's failure and Mr. Skeie's success caused immediate and serious problems for both Mr. Skeie and the Agency that set the course for another run.

### III.

### Deals Undone And The Big Deal.

*Deals Undone.*

Neither the State Commerce Department, which regulates the Winger Bank,

---

**5.** The Twin Valley Bank is subject to regulation by the Minnesota Department of Commerce, since it is a state chartered bank. The FDIC also had limited, but powerful, regulatory authority as insurer of deposits at the bank. And, of course, the Federal Reserve Board, through the Federal Reserve Bank of Minneapolis, regulated the holding company, Oppegard Agency, which owned the Bank.

nor the Federal Reserve Bank of Minneapolis, which regulates its holding company—Financial Services of Winger, was pleased with the Winger Bank's acquisition of American National's interest in Mr. Oppegard's notes and Agency shares. The Federal Reserve was especially upset. In a letter to Mr. Skeie on April 19, 1990, the Bank's assistant vice president wrote:

> As you were informed in conversations with Reserve staff, it is the position of the Federal Reserve Bank of Minneapolis that no prior approval was necessary for Winger Bank to purchase the Oppegard loan. This conclusion was based on a statement by you that Winger Bank would take no action to dominate, control, or influence the operations of Oppegard Agency or its subsidiary banks. However, it is also the position of the Reserve Bank that *any action* on the part of Winger Bank to take an active role in the operation of Oppegard Agency or to foreclose on the stock of Oppegard Agency will constitute a violation of the Bank Holding Company Act of 1956, as amended ("BHC"). This would also constitute a violation by Winger Bank's parent company, Financial Services Of Winger, as it would have indirectly acquired an interest in an additional bank holding company without prior Federal Reserve approval. In light of previous discussions with our staff, the history of unsuccessful attempts to acquire Oppegard Agency, and this letter, we would view any such violation as willful. Any willful violation of the BHC Act could expose Winger Bank, its parent company, (Financial Services of Winger), its management, and directors to substantial monetary penalties.... Section 2 of the BHC defines control to include situations where a company directly or indirectly, or acting through one or more persons owns, controls or has the power to vote 25% or more of any class of securities of the bank or company; .... Based on the above, we conclude that any action on the part of Winger Bank to foreclose and take possession of the Oppegard Agency stock or to influence the election of the board of directors of either Oppegard Agency or its subsidiary banks without the prior approval of the Federal Reserve System will be a violation of the BHC Act. In addition, the transfer of the note to an affiliated party would also raise issues, if the related party took actions to control Oppegard Agency or its subsidiary banks. Actions of related parties could also raise questions under section 9 of the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA"). This section requires that prior notice be given before there is any change in the directors or senior management official by the functions that individual performs rather than by title. Thus, before any related individual performs on behalf of Oppegard Agency, they should consult with the Reserve Bank to ascertain any prior notice requirements.

The Winger Bank was the holder of an interest in 92% of the outstanding shares of Oppegard Agency that it could neither foreclose upon nor vote.[6]

While Mr. Skeie considered his options in light of the chilly reception given to the acquisition by the regulatory authorities, the Erskine Bank went without capital injection. Conditions were not improving at the bank. On June 29, 1990, the FDIC issued its notice to terminate insured status

---

**6.** The Minnesota Deputy Commissioner of Commerce, in a letter to Mr. Skeie dated May 18, 1990, wrote:

> On the face of the records of the Winger Bank, the transaction appears to be in the regular course of business and may even be a type of loan or credit included in the bank's lending policy statement. I must say, however, considering your personal interest in the attempted acquisition of the banks, whose stock the collateral on the purchases [sic] notes represents indirectly, the transaction could be viewed as an indirect use of bank funds by an officer and director in violation of Minn.Stat. § 48.08.... The concern also goes further in terms of prudent lending practices where it appears a credit, whatever the speculative yield or profit may be, rests its entire repayment prospects on liquidation of collateral.... This letter should serve to put you on notice that consideration is being given to further examination of the practice to resolve the issues this unusual transaction provokes....

of the Erskine Bank for, among other things, failure to comply with its cease and desist order of May 16, 1989, by increasing the bank's equity capital by not less than $550,000. Hearing was set on the termination action for August 27, 1990.

Mr. Oppegard did not have possession of his shares, but he still controlled the Agency. Reacquisition of the pledged shares no longer seemed possible. The FDIC action presented the urgent need to capitalize the Agency and downstream substantial capital to the Erskine Bank. For Mr. Oppegard, the challenge was to engineer a stock issue to Mr. Dobberstein and Mr. Moen that would leave Mr. Oppegard with essentially the same controlling interest in the Agency that he would have enjoyed in the deal had his attempt to repurchase his pledged shares from American National succeeded in April.

By mid-July, Mr. Skeie had reached the conclusion that Farmer's State Bank of Winger must divest itself of the Oppegard notes and the security interest in the Oppegard Agency shares. Apparently, no immediate transferee, other than himself, was available to acquire the Winger Bank's position. Accordingly, notwithstanding the "affiliated party" transfer warning of the Federal Reserve Bank in its earlier letter of April 19, 1990, Mr. Skeie purchased an assignment of the Winger Bank's rights to the notes, security agreement, and pledged Agency shares on July 20, 1990.

While Mr. Skeie might have been prepared to deal with issues arising from his status of "affiliated party" as the new holder of the notes and security agreement involving the shares, he was not prepared for the situation he discovered concerning the shares themselves. The pledged shares that had represented 92% of all outstanding stock in Oppegard Agency, now represented only 8% of the outstanding shares as a result of recapitalization of the Agency that had been accomplished eleven days before Mr. Skeie acquired Winger Bank's interest in them.

*The Big Deal.*

On June 13, 1990, Mr. Oppegard obtained authorization from the Agency board of directors to amend the corporation's articles increasing the authorized shares from 26,000 to 100,000. On July 9, 1990, a special board meeting was held to recapitalize the Agency. Existing shares were valued, based on the offer made earlier to American National by Mr. Amundson, at $10.00 per share.[7]

Ten thousand new shares were issued to Mr. Moen for an investment of $100,000 cash. Ten thousand new shares were issued to Mr. Dobberstein for $100,000 cash.[8] Fifty-nine thousand new shares were issued to Rudell Oppegard in satisfaction of claimed "off ledger" liabilities of the Agency to him.[9] Five thousand new shares were issued to Rudell Oppegard for $50,000 cash.[10] Additionally, the board approved a purchase contract for William Roeszler, president of the Erskine Bank, to purchase 7,450 shares over eight years at $10.00 per

---

7. Minutes of the meeting read, in pertinent part: The board reviewed the April 4, 1990 offer of $65,000 made by Mr. Lloyd Amundson and accepted by American National Bank of St. Paul for 7,431 shares of Oppegard Agency, Inc. for a value of $8.85 per share. To cover any unknown additional value, the board set the price per share at ten dollars ($10.00).

8. The issue to Mr. Dobberstein recognized a $75,000 present contribution (funds that had been placed in trust pursuant to the March agreement), and $25,000 loaned in March, which was used to pay down Agency debt.

9. These are termed "off ledger" liabilities because they never appeared in the financial statements of the Agency prior to surfacing at the July 9, 1990, board meeting. None of the items recorded in the minutes to support the liabilities was legitimate. All were either transactions created after the fact for the specific purpose of supporting the stock issue, or were transactions reformed after the fact to shift existing liabilities to the Agency for the same purpose. A secretary who was subsequently typing the minutes of the meeting informed Mr. Roeszler that some of the claims had been paid. Mr. Oppegard, upon being so informed, met with his accountant and, at an October 16, 1990, board meeting, substituted other illegitimate claims.

10. Apparently, this cash was part of the $100,000 originally loaned to Mr. Oppegard by Mr. Moen in March, a portion of which initially was to be used to buy back Mr. Oppegard's pledged shares.

share. With the new issue, status of shares was:

| | |
|---|---|
| 7,436.8 shares | Rudell Oppegard (old pledged) |
| 438.3 shares | Lorraine Oppegard (old) |
| 70.3 shares | Claude Oppegard (old) |
| 63.8 shares | Paul Oppegard (old reissued to Rudell) |
| 63.8 shares | Jeanne Oppegard (old reissued to Rudell) |
| 59,000.0 shares | Rudell Oppegard (new "off ledger") |
| 5,000.0 shares | Rudell Oppegard (new cash) |
| 10,000.0 shares | Lowell Moen (new cash) |
| 10,000.0 shares | Gordon Dobberstein (new cash) |
| 7,450.0 shares | William Roeszler (subject to contract) |
| 477.0 shares | Unsubscribed |

Mr. Moen's $100,000 loan to Mr. Oppegard, initially made in part to assist in getting his pledged shares back from American National, became secured by all new shares issued to Mr. Oppegard. A buy/sell agreement was authorized at the July 9 board meeting. The agreement, eventually executed on August 20, 1990, provided for mandatory purchase by non-debtor shareholders, at graduated discounts from equity book value over a five-year period, of a debtor shareholder's shares that might become subject to involuntary transfers through foreclosure or otherwise.[11] The new shares were judgment proof.

Following the recapitalization, $323,000 was downstreamed from the Agency to capitalize the Erskine Bank. Of that amount, $100,000 was from an approved dividend paid by Twin Valley Bank, and the rest was from the cash paid into the Agency for the new stock. The FDIC subsequently cancelled the August 27, 1990, hearing to terminate insurance at the Erskine Bank.

Although Mr. Oppegard averted FDIC action against the Erskine Bank by the recapitalization of the Agency, the structure of the deal would bring his banking career to an abrupt and unpleasant end.

---

11. The agreement provided for purchase at an 80% discount on an occurrence during the first year, a 60% discount during the second year, a 40% discount during the third year, a 20% discount during the fourth year, and no discount during the fifth year. The agreement applies to "corporation stock now or hereafter held by the shareholders".

## IV.

### Deflation Of The Big Deal.

The Federal Reserve Bank of Minneapolis was not favorably impressed with the Agency issue of 59,000 shares to Mr. Oppegard for "off ledger" liabilities. An inquiry began in January 1991, and disciplinary proceedings were subsequently commenced against Mr. Oppegard. On October 15, 1991, he signed consent orders in proceedings before the Board of Governors of the Federal Reserve System that resulted in the cancellation of the 59,000 shares, assessment of a civil penalty in the amount of $10,000, acknowledgement of an obligation to reimburse the Oppegard Agency $62,262, prohibition of any future participation in the Agency, and his removal from banking generally. Among other things, Mr. Oppegard was required to:

> Submit to the Reserve Bank a written plan to divest fully his ownership interest in the Company [Oppegard Agency] by no later than December 31, 1991. Such plan shall, at a minimum, require: (A) the cancellation, by no later than December 31, 1991, of the 59,000 shares of Company stock issued to Oppegard on or about July 9, 1990....

By December 19, 1991, the shares had not been cancelled. In a letter to the Agency, dated that day, the Federal Reserve Bank of Minneapolis directed the Agency to cancel the shares before the end of the year. The Agency was also advised that cancellation might result in certain shareholders being in violation of the Change in Bank Control Act, and that the Agency should assist those individuals in compiling information necessary to prepare required notices for change in control.[12]

The 59,000 shares were cancelled by the Agency at a special board meeting on De-

---

12. After cancellation of the 59,000 shares, Mr. Moen and Mr. Dobberstein would each own and control more than 25% of the Agency. Notice was required under 12 U.S.C. § 1817(j) and section 225.41 of the Board of Governors' Regulation Y (12 C.F.R. § 225.41).

cember 31, 1991. Following the board action, shareholder status in the Agency was:

| | |
|---|---|
| 10,000.0 shares | Lowell Moen |
| 10,000.0 shares | Gordon Dobberstein |
| 5,000.0 shares[13] | Rudell Oppegard |
| 7,431.8 shares | Rudell Oppegard (pledged) |
| 483.3 shares | Lorraine Oppegard |
| 127.6 shares | Rudell Oppegard |
| 70.3 shares | Claude Oppegard |
| 450.0 shares | William Roeszler |
| 7,000.0 shares | Subscribed contract (Roeszler) |
| 59,482.0 shares | Unsubscribed |

A retroactive Notice of Change in Control of the Agency was subsequently filed with the Federal Reserve Bank of Minneapolis and with the Minnesota Department of Commerce regarding the ownership and control status of Mr. Moen and Mr. Dobberstein.

On July 3, 1992, the Federal Reserve Bank of Minneapolis notified Mr. Moen and Mr. Dobberstein by letter that the Federal Reserve System would not disapprove the Agency stock issue to them the preceding July 9, 1991.[14] The Minnesota Department of Commerce gave similar notice by letter of July 21, 1992.

## V.

### Focusing Mr. Skeie's Claim.

*The Allegations.*

Mr. Skeie explains the theory of his case against Oppegard Agency, Mr. Moen, Mr. Dobberstein and Mr. Roeszler in his trial brief. He states:

> Counterclaim Defendants have engaged in scheme [sic], individually or in concert, to defraud him by eroding his position as a secured creditor in 92.1% of the outstanding shares of O.A.I. (Oppegard Agency). Skeie believes the Counter-

claim Defendants have undertaken a series of fraudulent transactions that amount to violations of Minn.Stat. § 302A *et. seq.* (Minn. Business Corp. Act), and violations of Minn.Stat. § 513.41 *et. seq.* (Fraudulent Conveyance Act) resulting in their unjust enrichment at the expense of Skeie. Under Minn. Stat. § 302A and 513.41, Skeie seeks an equitable remedy for the knowing or willful attempts of the Counterclaim Defendants to defraud Skeie.

Skeie Trial Brief, p. 9.

The alleged violations of Minn.Stat. § 302A are linked to the July 9, 1990, new stock issue itself and the events leading up to it. Mr. Skeie claims that Minn.Stat. § 302A.435 (notice of shareholder meeting) was violated to prevent Farmer's State Bank of Winger from appearing and protecting its rights as a pledgee by voting the pledged shares against the issue.[15] He claims that the preemptive rights provision of Minn.Stat. § 302A.413 was violated to prevent the pledgee's exercise of the right of first refusal to acquire newly issued shares.[16] Finally, Mr. Skeie alleges that the entire issue was in violation of Minn. Stat. § 302A.405 as fraudulent in that all shares were intentionally grossly undervalued to destroy the value of the Winger Bank's collateral.

The alleged violations of Minn.Stat. § 513.41 *et seq.* are linked, for the most part, to the post-issue encumbrance of Mr. Oppegard's new shares. Mr. Skeie, in his post-trial brief, identifies these transfers:

> i. Oppegard's Transfer to the Agency. Oppegard transferred $50,000 and forgave fictitious antecedent debt of O.A.I.

---

**13.** Mr. Moen subsequently foreclosed his security interest in these shares upon default by Mr. Oppegard on outstanding loans.

**14.** Apparently, Mr. Skeie communicated an objection to the Federal Reserve. However, it was the view of the Federal Reserve System that "Mr. Skeie's concerns should be addressed in the court system".

**15.** The record does not reflect that any shareholder meetings were held in connection with the acts Mr. Skeie complains of. All meetings that are the focus of the adversary proceeding were director meetings. Had there been any

shareholder meetings, it is not readily apparent how the Winger Bank might have exercised its right to vote the pledged shares, assuming it otherwise had such a right, since it was prohibited from voting the shares by the Bank Holding Company Act and had been so informed by the Federal Reserve Bank of Minneapolis.

**16.** The statute provides that a shareholder has preemptive rights unless denied in the articles. See: Minn.Stat. § 302A.413, Subdivision 1. The Articles of Incorporation of Oppegard Agency, Inc. deny shareholders preemptive rights. See: Agency Exh. 1.

in exchange for 64,000 shares of stock. Oppegard immediately encumbered the 64,000 shares of stock by entering into security agreements with Lowell Moen, Gary State Bank and Dobberstein. Oppegard Depo. at 200. In fact, Oppegard received the $50,000 from Lowell Moen after agreeing to transfer a security agreement to Moen. *Id.*[17]

ii. Oppegard's Transfer to Gary State Bank.

Oppegard transferred a security interest in his 54,000 shares of stock to Gary State Bank in exchange for a $85,000 loan. *Id.;* Moen Depo. at 84–85. Oppegard has no ability to repay this $85,000 loan. 1990 Dobberstein Depo. 95.[18]

iii. Oppegard Transfer to Dobberstein.

Oppegard transferred a security interest in 54,000 shares of stock to Dobberstein in exchange for two personal loans to Oppegard of $20,000 and $5,000. Oppegard Depo. at 200; 1990 Dobberstein Depo. at 73–74, 90–92. Oppegard also extinguished a debt of $25,000 for which Dobberstein was given 2,500 shares of stock in O.A.I. 1990 Dobberstein Depo. at 30. Finally, Dobberstein transferred $75,000 to O.A.I. as consideration for 7,500 shares of stock. 1990 Dobberstein Depo. at 38–39. Oppegard agreed to name Dobberstein as a Director of the Agency.[19]

iv. Oppegard Transfer to Moen.

In exchange for purchasing 10,000 shares of the Agency stock for $100,000, Oppegard agreed to provide Moen with a position of director in the Agency and a security interest in Oppegard's 54,000 shares of stock. 1990 Moen Depo. at 40–41, 43; Oppegard Depo. at 200; Like Dobberstein, Moen agreed to be found [sic] by the Buy–Sell Agreement.[20]

iv. [sic] Oppegard Transfer to Roeszler. In exchange for a purchase contract between O.A.I. and Roeszler, O.A.I. through Oppegard, agreed to provide Roeszler with the option to purchase 7,450 unissued shares at $10.00 a share over the next eight years. Roeszler, as a director of the Agency was instrumental in the transfers made by Oppegard to the other Counterclaim Defendants. To delay Oppegard's creditors, Oppegard and Roeszler caused the Agency, based on fictitious debt to issue new stock in an attempt to hinder, delay and defraud a judgment creditor.

Skeie Post–Trial Memorandum, pp. 28, 29.

*The Claim.*

Reducing these allegations to the thesis of a claim, it appears that Mr. Skeie asserts that the Agency, Mr. Moen, Mr. Dobberstein, and Mr. Roeszler, conspired to defraud him and his predecessor pledgee of the value of his security interest in 7,436.8 shares of Agency stock by knowingly and willingly causing and participating in the fraudulent issue of shares to Rudell Oppegard and to themselves for no or inadequate consideration, resulting in destruction or substantial dilution of the preexisting pledged shares. To remedy the fraud, Mr. Skeie does not ask for money damages, but:

[S]eeks an equitable remedy which include [sic] the cancellation of all shares of stock issued by the O.A.I. Board in 1990. Not only does Mr. Skeie seek cancellation of all shares issued to Moen, Dobberstein and Roeszler due to their

---

17. Understanding this allegation is difficult. Actions based on fraudulent transfers rest on the premise that a transferor has received less than reasonable equivalent value for an interest in property transferred. Here, under Mr. Skeie's theory of the case, Mr. Oppegard (the transferor) received more, not less, from the Agency than the value of what was transferred to the Agency.

18. The Gary State Bank is no longer a party to this proceeding.

19. Mr. Skeie has not explained the relevance of the transfer of a security interest in the 54,000 new shares for the $25,000 loan, in light of subsequent cancellation of the shares.

20. The security interest given to Mr. Moen was for a $100,000 loan to Mr. Oppegard, which was separate from the $100,000 Mr. Moen paid for his 10,000 shares. Mr. Skeie has not explained the relevance of this transaction in light of the subsequent cancellation of the shares.

knowledge and participation in the scheme to defraud Mr. Skeie, but Mr. Skeie also seeks to have this Court award and transfer all remaining shares held in Mr. Oppegard's name to Mr. Skeie to satisfy any remaining deficiency.[21]

Skeie Post–Trial Memorandum, p. 35.

## VI.

### Standing.

This adversary proceeding was an action originally commenced in state district court in Ramsey County, Minnesota. It was removed here upon the filing of the Agency for relief under 11 U.S.C. Chapter 11. The Counterclaim Defendants moved the state court early in the action for dismissal or summary judgment against Mr. Skeie for lack of standing. That motion was denied by order of The Honorable Lawrence D. Cohen of the state district court. The Counterclaim Defendants renewed the motion in this Court just before trial. Mr. Skeie argues that Judge Cohen's order is the law of the case regarding the matter. It is not the law of the case for two reasons.

First, the motion before the state court was treated as a motion for summary judgment and was denied based on the existence of material questions of fact. Nothing in the order or the accompanying memorandum of the court suggests that the court intended to make a final determination of the issue of standing.

■ Second, questions of standing involve determination of judicial procedure, not substantive law. State court procedural determinations cannot control later procedural determination of issues that arise in a federal court regarding a removed case, even when the determination might involve the same subject matter. Each forum determines its own procedure.[22] See: *Redfield v. Continental Casualty Corp.*, 818 F.2d 596 (7th Cir.1987).

The Counterclaim Defendants' position on lack of standing is premised upon the undisputed facts that Mr. Skeie had no interest in the Agency when the disputed shares were issued. On July 11, 1990, he was not a shareholder, pledgee, or creditor. Accordingly, they argue, *PJ Acquisition Corp. v. Skoglund*, 453 N.W.2d 1 (Minn. 1990), mandates dismissal due to Mr. Skeie's lack of standing to seek the relief he requests. Specifically, the Counterclaim Defendants quote this language from the case:

> [We] observe that nowhere in Minn.Stat. ch. 302A nor in Professor Olson's law review article [*A Statutory Elixir for the Oppression Malady*, 36 Mercer L.Re. 627 (1985)] does one find any intimation that a shareholder, who acquires shares after the commission of the acts alleged to have resulted in improper diversion of corporate assets, may maintain direct equitable action in its own name when seeking relief similar to that sought by appellant in this case. Nor is that surprising. It has long been the law that a shareholder who purchases stock in a corporation is prevented from maintaining a derivative suit if the alleged wrongs forming the basis of the suit occurred before the shareholder's acquisition of its stock. *See* e.g., *Bateson v. Magna Oil Corp.*, 414 F.2d 128, 130 (5th Cir.1969), *cert. denied sub nom Magna Oil Corp. v. Bateson*, 397 U.S. 911, 90 S.Ct. 909, 25

**21.** As an alternative, Mr. Skeie argues:

At a minimum, to avoid Counterclaim Defendants' unjust enrichment at Skeie's expense, the Court should cancel a sufficient amount of their O.A.I. stock to bring their proportions of ownership into line with the money they actually contributed to Oppegard Agency.

Skeie Post–Trial Memorandum, p. 41.

Apparently, Mr. Skeie also seeks cancellation of the buy/sell agreement executed by the parties on August 20, 1990. The reason is not clear. The agreement only applies to the newly issued shares, and all of Mr. Oppegard's newly issued

shares have either been cancelled or foreclosed upon.

**22.** Of course, if this were a case where Mr. Skeie had standing in state court but not federal court, the appropriate remedy would be remand, not dismissal. Counterclaim Defendant Agency removed the dispute here. Accordingly, it would hardly be fair to dismiss the case on its motion for lack of standing in federal court, rather than remand it, if standing existed in the state court.

L.Ed.2d 91 (1970). Rule 23.06 likewise makes that clear. No reason is readily ascertainable why in 1983 when it enacted Minn.Stat. ch. 302A, the legislature had any intention to provide personal equitable relief to one, who, at the time of the alleged misfeasance or malfeasance by officers or directors, owned no shares. Indeed, it seems to us the contrary conclusion—that the plaintiff must have been a shareholder, as defined by Minn. Stat. § 302A.011, subd. 29 (1988), at the time of the alleged wrongs—would be the proper result. [Footnote 12. Footnote 12 reads: In this case we need not hold that a shareholder plaintiff alleging actions causing him direct damages under 302A.751, subd. 1, must always have to satisfy the contemporaneous ownership and demand requirements of Rule 23.06. But when proper analysis of the complaint leads to the conclusion that, indeed, the action is derivative, the Rule 23.06 requirement must be met. We note in passing, however, that it can be reasonably argued that even in an action seeking direct equitable action under the statute, the plaintiff must have been a shareholder, as defined in the statute (Minn.Stat. § 302A.011), at the time of the alleged malfeasance.] Commentators writing on the statute seem to have so assumed. *See*, e.g., *Olson, A Statutory Elixir for the Oppression Malady*, 36 Mercer L.Rev. 627 (1985); Note, *The Limited Liability of Corporation Directors under Minnesota Statute § 302A.251, subdivision 4 (1987)*, 11 Hamline L.Rev. 371 (1988).

*PJ Acquisition*, 453 N.W.2d 1, at p. 6.

Rule 23.06 of the Minnesota Rules of Civil Procedure no longer applies to the issue of standing in this case. Rule 23.1 Fed.R.Civ.P. applies through Rule 7023.1 Federal Rules of Bankruptcy Procedure. Rule 23.1 Fed.R.Civ.P. is similar to Rule 23.06 of the Minnesota Rules of Civil Procedure in that a complaint in a derivative shareholder action must allege that the plaintiff was a shareholder or member at the time of the transaction complained of. Two areas of inquiry are appropriate to the determination of Mr. Skeie's standing to seek the relief he requests.

The first inquiry is whether the action is a shareholder derivative suit. Fraud may give rise to claims for direct shareholder recovery under Minnesota law when the fraud causes separate and distinct injury to a plaintiff shareholder. See: *Arent v. Distribution Sciences*, 975 F.2d 1370 (8th Cir.1992). Assuming Mr. Skeie's allegations to be true, the value of his pledgee interest in Oppegard's pre-July 11, 1990, stock was seriously diminished through fraud committed by the Counterclaim Defendants for the specific purpose of destroying its value. A cause of action for relief based upon such an allegation is not a derivative action, and 23.1 Fed. R.Civ.P. has no application.

The second area of inquiry is whether the action is one under Minn.Stat. § 302A.751, Subd. 1, and, if so, whether *PJ Acquisition*, supra, footnote 12 (quoted above), would require that Mr. Skeie have held a shareholder interest at the time of the acts complained of in order to seek relief under that statute. The Court concludes that Mr. Skeie's action is not one under Minn.Stat. § 302A.751, Subd. 1. Accordingly, no further discussion of *PJ Acquisition*, footnote 12 is necessary.

Minn.Stat. § 302A.751, Subd. 1, as it relates to shareholders, provides remedies with respect to internal corporate affairs among shareholders, directors, officers and certain employees. This is not an action concerning the internal affairs of the Agency among its shareholders. It is an action for fraud by a secured creditor seeking relief based upon alleged intentional injury to his collateral. Speaking of the inapplicability of corporate statutes to actions such as Mr. Skeie's, another court observed:

It is clear that s 1206 applies to disputes concerning the business and affairs of the corporation. Section 1206 does not, however, preclude a party from seeking redress for a personal injury caused by an actor in his private capacity simply because the actor uses his position in the corporation to assemble the weapons necessary to effect his private scheme. We,

therefore, reject defendant's contention that s 1206 precludes the plaintiffs from seeking a rescission of the shares on the grounds that Klein defrauded them of payment and their security interest by fraudulently issuing and conveying 2,100 shares of stock. *Simcox v. San Juan Shipyard,* 754 F.2d 430, 438 (1st Cir.1985).

This Court adopts the same reasoning and concludes that Minnesota corporation statutes do not preclude Mr. Skeie from seeking rescission of the Agency shares issued on July 11, 1990, on the grounds that Rudell Oppegard and the Counterclaim Defendants defrauded him of the value of his security interest.

■ Since neither Rule 23.1 Fed.R.Civ. P., nor the Minnesota corporation statutes apply, there is no apparent reason to consider a contemporaneous ownership rule as a measure of Mr. Skeie's standing to seek the relief requested. Under Minnesota law, assignees are ordinarily entitled to enforce all the rights and claims attendant to the security interest that would otherwise be enforceable by their assignors. See: e.g., *Marquette Appliance v. Economy Food Plan,* 256 Minn. 169, 97 N.W.2d 652 (1959). Accordingly, the Court finds that Mr. Skeie has standing to seek rescission of the remaining outstanding shares issued by the Agency on July 11, 1990.

## VII.

### Measuring Value, Acts And Injuries.

On July 9, 1990, Mr. Oppegard fraudulently caused the issue of 59,000 shares of Oppegard Agency stock to him for the specific purpose of destroying the value of his preexisting shares and allowing his continued control of the Agency. Those shares were subsequently cancelled by order of the Federal Reserve System on December 31, 1991. The dispute here is whether Mr. Moen, Mr. Dobberstein, and Mr. Roeszler participated in a fraudulent scheme with Mr. Oppegard that tainted the entire July 9 issue. In considering the question, acts and injuries are appropriately explored in context of the environment of their occurrence, and in light of the burden of proof.

■ Mr. Skeie carries the burden of proof by preponderance. His theory is that Mr. Moen, Mr. Dobberstein, and Mr. Roeszler participated in a fraudulent scheme for their personal gain, knowing and intending that they would acquire their shares for only a fraction of true value at the expense of Farmer's State Bank of Winger and its assignees. But even if they did not intend their own personal gain, Mr. Skeie contends, the Counterclaim Defendants knowingly participated in the fraudulent issue of the shares to Rudell Oppegard and, without cancellation of the Oppegard shares, he argues, they will have become unjustly enriched by the fruits of their fraud. Cancellation or adjustment of their shares, he urges, is the appropriate relief.[23]

Mr. Skeie's theory of the case rests on his valuation of Oppegard Agency immediately prior to the July 9, 1990, stock issue. He asserts that the Value of the Agency was as high as $1,000,000 ($123.95 per share), and not lower than $369,000 ($45.75 per share). Since the measure of acts and injuries is inextricably bound to value of the Agency, it is appropriate to measure value first.

### Value of Oppegard Agency Before the July 9 Issue.

Mr. Skeie measures a high value range of $670,680 to $1,000,000 of Oppegard Agency before the July 9, 1990, recapitalization. His calculations are based alternatively on: 1) what Mr. Moen and Mr. Dobberstein apparently were willing to accept in March 1990 in return for their individual investments, a 10% ownership interest; and, 2) the percent of their purchased shares to the total outstanding shares after

---

**23.** Mr. Skeie does not explain why equitable relief of cancellation is more appropriate than an award of money damages against the Counterclaim Defendants. Given the nature of the Agency, the regulatory authority of the Federal Reserve System over shareholder ownership and control status, and given the past actions of the Federal Reserve regarding prior and present shareholder status, the propriety of judicially determining shareholder status is dubious, especially where money damages would adequately compensate Mr. Skeie.

the issue.[24] Neither of these approaches is particularly probative of value.

What Mr. Moen and Mr. Dobberstein were willing to accept in March 1990 for their investment is no more persuasive of Agency value than what American National Bank was willing to accept for the pledged shares representing 92% total equity ($65,000); or, what Farmer's State Bank of Winger and Mr. Skeie were willing to pay for the pledged shares ($115,000). Mr. Skeie's calculation, based on percent of the purchased shares to the total outstanding issues after the recapitalization includes the 59,000 fraudulently issued shares. Inclusion of worthless shares in the equation dramatically inflates total share value. See: footnote 22, *supra.*

■ A better approach is to consider: 1) available financial information concerning the Agency, such as financial statements; 2) the nature of the Agency; 3) the condition of its banks; and, 3) who was willing to commit what to the Agency to protect its value.

According to its financial statements for fiscal year ended 1989, filed by the Agency with the Federal Reserve System, Oppegard Agency had a net worth of $639,467 on December 31, 1989.[25] The investment value in the Erskine Bank was stated at $90,378, and the investment value in the Twin Valley Bank was stated at $809,885. Approximately 50% of the stated assets of each bank consisted of loan portfolios. According to the consolidated balance sheet of the Agency and the banks, 48% of total assets consisted of loan portfolio. The accuracy of the stated net worth of the Agency heavily depended upon the accuracy of the stated value of the consolidated loan portfolio.

Accuracy of the stated value of the loan portfolio is dubious. The stated value was net of allowance for loan losses. Allowance for loan losses at the Erskine Bank had been determined by FDIC to be grossly inadequate, causing it to conclude that the portfolio was substantially overvalued and triggering the May 16, 1989, cease and desist order that required the Agency to inject $550,000 capital into the bank. A reasonable conclusion is that the Erskine Bank represented no investment value for the Agency, but was a substantial liability that largely offset the investment value of the Twin Valley Bank.[26] Since the two banks were the principal assets of the Agency, its net worth might have been

**24.** Mr. Skeie argues that Mr. Moen agreed to purchase *existing* shares from Mr. Oppegard (after their anticipated redemption from American National Bank) for $100,000 in return for 10%, which would indicate a total value of *existing* shares at $1,000,000. But even if the purchase by both Mr. Dobberstein and Mr. Moen were to be of new shares, Mr. Skeie argues, the deal evidences a pre-purchase value of existing shares at $745,500. ($200,000/.20 = $1,000,000 total value after investment. $1,000,000—$254,000 [actual total amount invested] = $745,500). As a second alternative, Mr. Skeie calculates value by dividing the individual investment, $100,000, by the fraction of ownership actually represented by the purchased shares, 10,000/92,518, and arrives at $925,180, from which he deducts the total amount invested ($254,500) to finally arrive at a pre-transaction value of $670,680. An apparent problem with the last approach is that the calculation does not exclude the 59,000 shares issued to Mr. Oppegard that had no value. Taking those shares out of the equation, it yields a total value of $335,180. After deducting the total amount invested, a pre-transaction value of $80,680 results (i.e.—$100,000 divided by 10,000/33,318 equals $335,180,

which when reduced by $254,500 results in $80,680).

**25.** The financial statements are part of *Annual Report of Bank Holding Companies–FR Y–6,* required annually by the Federal Reserve in its regulation of bank holding companies. No financial statements submitted by the Agency were audited statements. Although prepared by certified public accountants, the statements were merely compilations and they carried this disclaimer:

A compilation is limited to presenting in the form of financial statements information that is the representation of management. We have not audited or reviewed the accompanying financial statements and, accordingly, we do not express an opinion or any other form of assurance on them.

**26.** The Agency, as a bank holding company, is liable for the debts of both banks. In fact, assets of one are subject to be applied against the debts of an insolvent other. See: 12 U.S.C. § 1815(e). Accordingly, the value of the Agency's equity in Twin Valley Bank was dependent upon the health of the Erskine Bank.

little or nothing before the July 9, 1990, recapitalization.

Such a conclusion would not be inconsistent with the November 27, 1989, investment offer of the "Gary Group." The offer, made before the FDIC termination action was commenced against the Erskine Bank, was based on an accountant's review of appropriate books and records of the Agency and its banks, undertaken on behalf of the proposed investors. The offer called for the group to invest a total of $600,000 for an ownership interest of 60%. The offer assumed that there would exist pre-investment equity in the Agency of not less than $400,000. The offer had two important contingencies. One was that no debt would remain in the Agency prior to the investment, except $150,000. According to the Agency's 1989 financial statements, one-half its total ledgered debt of $301,500 would need to be paid to meet that contingency. The other contingency was that Mr. Oppegard inject whatever capital might be necessary to cover the shortfall in the event that the value of equity in the Agency was actually less than $400,000.

If the Agency had value approximating what Mr. Skeie argues it had, presumably he would not have experienced the continuing difficulty that plagued him in attempting to get his numerous change in control applications approved. Correspondence from the Federal Reserve Bank of Minneapolis is replete with expressed concerns about the financial health of the Erskine Bank, and of the Agency itself.[27]

Based on Mr. Skeie's strategies in seeking approval of change in control, it is reasonable to conclude that not even he believed the Agency had significant value. Mr. Skeie's objective was to acquire Twin Valley Bank, and he was interested in the Agency for that limited purpose. He was not willing to invest any of his own funds directly into the Agency or the Erskine Bank; nor could he obtain such an investment from anyone else.[28] A reasonable conclusion is that Mr. Skeie believed that the Twin Valley Bank had value if separated from the Erskine Bank, but that the Agency, with both Banks, had little value.

In light of his burden of proof, Mr. Skeie has not established that the value of Mr. Oppegard's preexisting pledged shares was greater than $10.00 per share immediately preceding the July 9, 1990, new issue.

*Acts and Injuries.*

Mr. Oppegard was concerned with the future of the Agency and his control of it. Mr. Roeszler was concerned with the future of the Erskine Bank and his role in it. Mr. Roeszler was hired as the president of the American State Bank of Erskine in late 1987. He was immediately aware that the bank was undercapitalized, and he began the search for a solution within the first six months of his employment at the bank.

While their concerns involved similar problems and potentially common solutions, the record does not reflect that Mr. Oppegard and Mr. Roeszler worked well together, or even that they significantly worked together at all. In a May 21, 1990, letter to Mr. Oppegard, Mr. Roeszler wrote:

[I]t would be better if we had regular meetings at the holding company level and start giving serious consideration to resolving these problems. I think if the FRB, State, and FDIC start to see that

27. The Agency had been operating under a cease and desist order from the Federal Reserve since February 5, 1986, prohibiting it from acquiring any debt without prior regulatory approval.

28. Even in his later proposals to the Federal Reserve, Mr. Skeie proposed to inject capital into the Agency in the form of loans to be obtained elsewhere. For instance, in his June 25, 1990, proposal on behalf of an associate, Mr. Frank Farrar, Mr. Skeie disclosed that the capital would come from a letter of credit obtained by Mr. Farrar. When it became clear that the Federal Reserve would not likely approve such

a proposal, he advised the Federal Reserve that he would restructure the proposal to provide for a direct capital contribution by Mr. Farrar of $550,000 of his own funds in exchange for stock. But a change in control application containing such a proposal was never filed.

In documents submitted to the Federal Reserve, Mr. Farrar had represented his net worth at $40,000,000. A reasonable conclusion is that if the Agency had the value now claimed, the necessary investment to acquire and protect that value would have been forthcoming. Mr. Farrar had been a participant in the change in control attempts since June, 1989.

you are developing a management team and not operating by shooting from the hip, they will start to give some credence to you. Right now we seem to solve one problem by creating two others.

Skeie Exh. 81.

In a June 1, 1990, letter to Mr. Oppegard's attorney, Mr. Roeszler wrote:

I should say that the directors up here as part of the job of preserving and protecting the assets, resources, and integrity of this Bank have put a lot of pressure on Rudy to make a deal with Mr. Moen and Mr. Dobberstein, and think very highly of them. However, there is concern about the lack of a formal process and controls in the series of transactions and from experience the Board has learned that this can mean big problems. Also, the main issue—money—has a way of being clouded over then [sic] things are not under control.

Skeie Exh. 85.

In the same letter, Mr. Roeszler expressed annoyance with Mr. Skeie, and concern that the pledged shares would be transferred by the Winger Bank to a third party, who might have greater rights than the Winger Bank and "be tough to deal with".

Mr. Roeszler clearly felt frustrated by Mr. Skeie. He viewed Mr. Skeie as an unnecessary and serious aggravation to an already serious problem. Mr. Roeszler knew that Mr. Skeie would not provide a source of capital for the Erskine Bank, and he was concerned that Mr. Skeie might jeopardize attempts to secure other sources of capital for it.

Yet, the record does not support Mr. Skeie's claim that Mr. Roeszler conspired with Mr. Oppegard to cause the issue of worthless shares to Mr. Oppegard as part of the July 9, 1990, recapitalization of the Agency. From the record, it appears that: Mr. Roeszler had little knowledge of what Rudell Oppegard was entitled to regarding the Agency; he was not privy to Mr. Oppegard's dealings with the Agency; and, he assumed that the stock was supported by consideration in the opinion, and with the approval, of the Agency's accountant.

Mr. Skeie asserts that Mr. Moen and Mr. Dobberstein knowingly participated in Mr. Oppegard's fraud, motivated by the desire to control the Agency. Mr. Moen and Mr. Dobberstein contend that they had no desire to take Mr. Oppegard's Agency or his banks away from him. The gentlemen say that they were motivated by two considerations. One was the need to save the Erskine Bank. The other was the desire to help a neighbor and fellow banker who appeared to be in financial trouble.[29]

Whatever their individual motivations might have been in the transaction, the record does not support a finding, by preponderance of evidence, that Mr. Moen and Mr. Dobberstein knew that Mr. Oppegard's "off ledger" claims against the Agency were illegitimate, or that they participated in a scheme with him to destroy the value of the pledged shares.[30] Equally balanced against that assertion, is the premise that: Mr. Oppegard did his own scheming; he structured the recapitaliza-

---

**29.** Why, in March 1990, would Mr. Moen agree to invest $100,000 in the Agency for 10% ownership, when he thought that his separate loan to Mr. Oppegard, in the same amount, would enable Mr. Oppegard to redeem his pledged shares and retain an 80% ownership interest in the Agency? And, why would either Mr. Moen or Mr. Dobberstein, in July 1990, on the eve of threatened closure of the Erskine Bank through termination of insurance by FDIC, agree to invest $100,000 in return for a percentage ownership in the Agency diminished by the impact of 59,000 shares that represented the satisfaction of "off ledger" liabilities of the Agency to Mr. Oppegard in the amount of $590,000? Possible answers to these questions are that these gentlemen: 1) had a secret, fraudulent scheme to take control of the Agency at the expense of Mr.

Skeie and Mr. Oppegard; 2) exercised poor business judgment; or, 3) had objectives other than maximizing returns on their investments.

**30.** Mr. Skeie points to the subscription agreement that both Mr. Moen and Mr. Dobberstein signed as evidence that they knew the issue was fraudulent. Paragraph (I) of the agreement reads:

Investor is aware that 92% of the Company's stock currently outstanding (and before any additional shares are issued) is pledged to secure indebtedness of the Company's principal shareholder, Mr. Rudell M. Oppegard, and that the issuance of additional shares will cause dilution in the value of those shares presently outstanding and possibly cause the party holding said pledged stock to initiate a

tion without full disclosure to Mr. Moen and Mr. Dobberstein; and, considering the Agency his, was prepared to rescue his position to the disadvantage of these gentlemen no less than he was prepared to destroy the value of his pledged shares in the possession of the Winger Bank.

Mr. Skeie has not shown that he suffered any injury in the matter that has not already been remedied. The fraudulent 59,-000 shares have long since been cancelled. Mr. Skeie has not shown that the shares issued to Mr. Moen and Mr. Dobberstein were not supported by fair consideration, or that they were obtained by these individuals through fraud. Although the recapitalization diluted the position of the holder of the pledged shares in that after the recapitalization the pledged shares represented a much smaller percentage of total outstanding shares, shareholders of the Agency had no preemptive rights to protect their relative positions.[31] Finally, it appears that the recapitalization, except for the shares issued to Mr. Oppegard, was an appropriate and necessary measure to save the Erskine Bank and to preserve the value of the Agency itself.

## VIII.

### Disposition.

Based on the foregoing rendition, analysis and consideration of the matter, **IT IS HEREBY ORDERED:**

1) Counterclaim Defendants' motion for dismissal for lack of standing is denied.

2) Counterclaim Defendants Lowell Moen, Gordon Dobberstein, and William Roeszler are entitled to judgment that the shares issued or committed to them by Oppegard Agency on July 9, 1990, were valid issues and commitments, and the same are not subject to cancellation or adjustment for fraud or any other reason arising from the transaction.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

---

lawsuit against the Company as well as the undersigned.

Skeie Exh. 90.

Clearly, the issue of shares for "off ledger" liabilities would dilute the value of preexisting shares. But that does not speak to the legitimacy of the "off ledger" liabilities. If the "off ledger" liabilities be illegitimate and there be no value to the new shares, then the dilution would "water" preexisting shares both by increasing the total number of outstanding shares and decreasing the per share value of preexisting shares. But if the "off ledger" liabilities be legitimate, no "watering" of the per share value of preexisting shares would occur. In the event of legitimate "off ledger" liabilities, only dilution by increase in number of shares would occur. If the liabilities had been legitimate, the issue of shares in satisfaction of the liabilities would have been valid, even though dilution of preexisting shares would have occurred by reason of the resulting increase in number of outstanding shares. As indicated earlier, the arti-

cles of the Agency denied shareholders preemptive rights that otherwise would have entitled the holders of preexisting shares to protect their positions with respect to the percentage of total outstanding shares held.

**31.** After cancellation of the 59,000 shares issued on July 9, 1990, to Mr. Oppegard (and after Mr. Moen's foreclosure on Mr. Oppegard's remaining new shares), shareholder status among the parties is:

| | |
|---|---|
| Arnold Skeie | 22% (from 92.1%) |
| Lowell Moen | 45% (from 0%) |
| Gordon Dobberstein | 30% (from 0%) |
| William Roeszler | |

Mr. Roeszler has a contract to purchase up to up to 7,450 shares at $10.00 per share for an eight year period following the July 9, 1990 issue. Apparently, the contract was offered as an incentive for him to rehabilitate the Erskine Bank and add value to the Agency. The record reflects that he has purchased 450 shares.