Alice E. WENZEL, et al., Respondents,

v.

Craig R. MATHIES, et al., Defendants,

Richard D. Donohoo, Appellant (C5–95–189) (C6–95–1044), Respondent (C1–95–190) (C3–95–420),

Bruce Rasmussen, Respondent (C5–95–189) (C3–95–420), Appellant (C1–95–190),

Capital Bank, Respondent (C5–95–189) (C1–95–190), Appellant (C3–95–420).

Nos. C5–95–189, C1–95–190, C3–95–420 and C6–95–1044.

Court of Appeals of Minnesota.

Jan. 16, 1996.

Review Denied March 28, 1996.

Mark M. Nolan, Peter J. McCall, Stapleton, Nolan & McCall, P.A., St. Paul, for respondent.

Thomas L. Fabel, David A. Allgeyer, Lindquist & Vennum, Minneapolis, for Richard D. Donohoo.

Bruce Rasmussen, pro se.

Scott R. Carlson, Rasmussen, Duckson & Carlson, Minneapolis, for Bruce Rasmussen.

George Serdar, Messerli & Kramer, P.A., Minneapolis, for Capital Bank.

Considered and decided by LANSING, P.J., CRIPPEN and NORTON, JJ.

## OPINION

LANSING, Judge.

This is a consolidated appeal from a jury verdict finding a holding company officer-director and a bank officer-director liable for breach of a fiduciary duty. The breach arose from a transaction in which the directors of the closely-held banking corporation doubled its outstanding shares, which they and their associates then purchased for a price substantially lower than book value.

The bank appeals the district court's entry of judgment notwithstanding the verdict, holding the bank vicariously liable for the breach. The equitable owners of the bank's holding company appeal the district court's restriction of their theory of recovery and one of the bank's officer-directors appeals an order for contempt. We affirm the verdict on breach of fiduciary duty, but vacate the order for contempt.

## FACTS

Capital Bank is a Minnesota banking corporation, formed under and governed by Chapter 300 of the Minnesota Statutes. Gilbert Wenzel cofounded the bank in 1956, and the Wenzel family has maintained a continuous financial interest. Until 1981 the Wenzel family, through a testamentary trust established by Gilbert Wenzel, owned all of the shares of Capital City Corporation, a single-asset holding company that in turn owned 99.04% of the shares of the bank.

In 1981 the Wenzel Trust (Wenzels) sold the bank by selling its holding-company shares to George Heaton in exchange for cash and an $800,000 note. Heaton secured the note by pledging the holding-company shares (100%) to the Wenzels. The amended purchase and sale agreement required Heaton to pay $4,000 monthly to Alice Wenzel, the trust's income beneficiary. Within three years the payments were in arrears, and Alice Wenzel hired Richard Donohoo, an attorney, to collect the overdue payments. Donohoo was unsuccessful and by early 1988 no longer represented Alice Wenzel.

In May 1988 Donohoo and Craig Mathies, a former Capital Bank officer, expressed an interest in purchasing Capital Bank. They purchased 142,000 holding-company shares (24.9%), and an option on the remaining shares, from George Heaton for $1,025,000. They paid Heaton $627,680.18 in cash and assumed one-half (roughly $400,000) of Heaton's liability to the Wenzels. Donohoo and Mathies both knew that 100% of the holding-company's bank stock secured an outstanding $4 million loan from Midwest Federal Savings and Loan Association to the holding company.

Donohoo and Mathies pledged their holding-company shares to the Wenzels to secure their half of the Heaton loan. The loan assumption agreement provided that Donohoo and Mathies' obligation and security were separate and distinct from Heaton's obligation to the Wenzels.

By late 1988 Donohoo had become president and a director of the holding company and president, director, and vice-chairman of the bank. Mathies was a bank director from late 1988 and then became executive vice president in 1989. Mathies and Donohoo approved each other's annual salaries of $100,000 and also hired Bruce Rasmussen, a college acquaintance of Donohoo, as a bank director.

By December 1988 Heaton had defaulted on the Wenzel note. He was also delinquent

on the Midwest Federal loan for which he was a guarantor. In December 1989 the Wenzels approached Donohoo about purchasing Heaton's stock but Donohoo declined. In January 1990 the FDIC informed the Bank that it was undercapitalized, and if it did not address the problem, the bank's FDIC insurance would be in jeopardy.

In February 1990 the Wenzels obtained a default judgment against Heaton for his 75% of the holding-company stock (and equivalent percentage of the bank stock). The stock was subject to a prejudgment attachment order in an unrelated federal court action, and the Wenzels did not obtain delivery until August 1990.

During this time the Wenzels were negotiating a sale of the holding company stock. Two investors signed a purchase agreement and made a deposit pending the delivery of the stock and a due diligence period. At the same time, Donohoo and Mathies decided to increase the bank's shares from 6,750 to 13,750. Donohoo, Rasmussen, Craig Mathies' wife, and two other investors purchased the new stock for $1 million. It appears that a substantial amount of the money used to purchase the stock may have been obtained from Capital Bank loans to some of the "investors." The stock was purchased for approximately $142 per share, even though the book value (equity capital divided by shares) of the preexisting shares was $322 per share.

The additional 7,000 bank shares were issued at a special shareholder meeting. Donohoo and Rasmussen attended the meeting but they did not notify Heaton or the Wenzels. Donohoo, as president of the holding company, voted all of the holding company's bank shares (99.04%) in favor of the stock increase, thereby relinquishing the holding company's controlling interest in the Bank.

As a result of the sale, the bank gained some infusion of capital to address the undercapitalization problem; Donohoo and Mathies were able to maintain control of the bank despite their default in payments to the Wenzels; the holding company no longer had a majority of the bank stock; the Wenzels' foreclosure of Heaton's stock could not provide a controlling interest in the bank; the Wenzels' proposed purchasers withdrew from

their agreement because the Wenzels could not convey a controlling interest; and Midwest Federal lost a significant part of its secured interest.

In September 1990 the Wenzels sued Donohoo, Mathies, Rasmussen, the new investors, and the bank for breach of fiduciary duty. While this suit was pending, Lloyd Amundson purchased the Midwest Federal note from Resolution Trust for $1.1 million. Amundson obtained a default judgment against the holding company for approximately $6 million. He partially satisfied the judgment by foreclosing on the original 6,685 bank shares that secured the loan. He then purchased the 7,000 new shares for $3,210,576 ($380.91 per share). Amundson agreed to assist the new investors, including Donohoo and Mathies, in defending against the Wenzels' lawsuit and not to make any claims against them as a result of the litigation. In addition, Amundson agreed to pay Donohoo and Mathies each $300,000 in a "consulting and noncompete agreement."

The jury found that Donohoo, Mathies, and Rasmussen had breached a fiduciary duty to the Wenzels. The jury further found that the three acted within the scope and course of their bank employment and that Donohoo and Mathies, as stock pledgors, breached a separate duty to the Wenzels. The jury found that the Wenzels were entitled to damages of $500,000 from Donohoo, $23,600 from Rasmussen, and no damages from Capital Bank.

The district court, in response to posttrial motions, granted the Wenzels' judgment notwithstanding the verdict, making Capital Bank vicariously liable for the amounts owed by Donohoo and Rasmussen.

## ISSUES

I. Did the Wenzels have standing to sue Donohoo and Rasmussen for breach of a fiduciary duty?

II. Does the law preclude a jury from finding a breach of fiduciary duty on these facts?

III. Does the evidence support the jury's award of damages for the breach?

IV.—VIII. Did the district court err in ordering JNOV finding Capital Bank vicariously liable, instructing the jury, restricting the measure of damages, denying prejudgment interest, or issuing a TRO?

## ANALYSIS

This case was pleaded, tried, and submitted to the jury under a theory of breach of a fiduciary duty. Donohoo and Rasmussen do not directly challenge the evidence supporting the breach, but argue instead that, as a matter of law, the Wenzels do not have standing to bring the action and are not owed a fiduciary duty. They also challenge the sufficiency of the evidence supporting damages and the jury instructions. We first address these arguments and the Wenzels' argument that the district court improperly limited their remedy for the breach. We then address Donohoo's appeal of a contempt citation for violating a temporary restraining order.

### I

■ Donohoo and Rasmussen assert that the Wenzels lack standing to bring this lawsuit because they were mere pledgees of the holding-company stock and could not be owed any fiduciary duty by the officers of the bank.

■ Minnesota has long recognized that pledgees of stock certificates held for the payment of a note have a legally protectible interest in the corporation's property. *See Baldwin v. Canfield*, 26 Minn. 43, 56, 1 N.W. 261, 272 (Minn.1879) (pledgees may sue to prevent loss or impairment of corporation's property). A federal court, applying Minnesota law, has recognized that a stock pledge has standing to bring a direct action when "seeking relief based on alleged intentional injury to collateral." *See In re Oppegard Agency, Inc.*, 152 B.R. 581, 591–93 (Bankr. D.Minn.1993). These holdings are consistent with other jurisdictions. The Third Circuit, interpreting Pennsylvania law, concluded that a pledgee has the same right to protect its equitable ownership as the pledgor. *In re Pittsburgh & Lake Erie R.R. Secs. & Antitrust Litig.*, 543 F.2d 1058, 1067 (3d Cir.1976) (derivative suit); *see also H.F.G. Co. v. Pio-*

*neer Publ. Co.*, 162 F.2d 536, 540–41 (7th Cir.1947) (beneficial owner need not also be record owner in order to maintain an action); *Silling v. Erwin*, 881 F.Supp. 236, 239 (D.W.Va.1995) (derivative suit) ("Persons with a clear beneficial interest in a corporation may bring a derivative suit without being shareholders of record.").

■ Although several of the cases recognizing a pledgee's standing involve shareholder derivative actions, the standing issue is identical in a direct action. A "corporate officer's duty of care and loyalty * * * extend[s] to pledgees of corporate shares as well as shareholders" because the pledgee has the same interests and concerns, and if the officers default, the pledgee suffers the same harm. *Gibson v. Manuel*, 534 So.2d 199, 202 (Miss.1988). A pledgee has the same right to bring an equitable action to preserve and protect corporate assets as the owner of the stock. *Weingand v. Atlantic Sav. & Loan Ass'n*, 1 Cal.3d 806, 83 Cal. Rptr. 650, 656, 464 P.2d 106, 112 (1970).

That the Wenzels were in the process of foreclosing on the pledged shares makes their case for standing even stronger because no other party would bring suit to protect their interest. *See F.D.I.C. v. Kerr*, 650 F.Supp. 1356, 1359 (W.D.N.C.1986) (pledgee had standing as equitable shareholder to maintain derivative action when "no party other than the [pledgee] would bring suit to protect the interest and value" of the corporation).

■ We reject Donohoo's arguments that *PJ Acquisition Corp. v. Skoglund* limits standing to recorded owners of the stock. 453 N.W.2d 1 (Minn.1990). The language cited by Donohoo only imposes a "contemporaneous requirement" that precludes a shareholder who purchases shares *after* harm to a corporation from bringing a derivative suit. *Id.* at 6. Donohoo also argues that the trial court erred in not requiring the Wenzels to bring a shareholder derivative suit rather than a direct action. A derivative action is required when the shareholder has suffered a harm that is indistinct from the harm suffered by other shareholders or by the corporation itself. *See Arent v. Distribution Sci-*

*ences, Inc.,* 975 F.2d 1370, 1374 (8th Cir. 1992). The Wenzels and Heaton together owned 75% of the holding company, but they were the only shareholders not given notice of the bank's issuance of new shares and not allowed an opportunity to buy the new shares at a substantially lower price than the preexisting shares' book value. Furthermore, the issuance of the stock destroyed their majority interest in the bank. These actions in the context of a closely-held, single-bank holding company, provide a basis for a direct action. *See Steelman v. Mallory,* 110 Idaho 510, 716 P.2d 1282, 1285 (1986) (holding that a direct action is permissible when "[t]he gravamen of [plaintiff's] complaint is that the majority shareholders/directors were attempting to squeeze him out.").

## II

■ Donohoo and Rasmussen, as a corollary to their argument on standing, assert that the directors of the bank, as a matter of law, do not owe a fiduciary duty to the shareholders of the bank's shareholder, the holding company. None of the litigants has provided direct authority on this issue.

■ We acknowledge that Donohoo's fiduciary duty is more obviously established because he was not only a director of the bank but also a director of the holding company and thus involved in both closely-held corporations, and he was additionally a pledgor (to the Wenzels) of approximately 25% of the holding company's shares. In a closely-held corporation, the shareholders, as well as the directors and officers of the corporation, have a fiduciary relationship that imposes the highest standard of integrity and good faith. *Pedro v. Pedro,* 489 N.W.2d 798, 801 (Minn. App.1992) ("The relationship among shareholders in closely held corporations is analogous to that of partners."), *review denied* (Minn. Oct. 20, 1992); *Evans v. Blesi,* 345 N.W.2d 775, 779 (Minn.App.1984), *review denied* (Minn. June 12, 1984). "Owing a fiduciary duty includes dealing 'openly, honestly and fairly with other shareholders.'" *Id.* Thus, Donohoo owed a fiduciary duty to the Wenzels who stood in the place of a fellow shareholder of the bank's holding company.

■ Although Rasmussen was not an officer of the holding company, we conclude that on these facts, as a bank director, Rasmussen also owed the Wenzels a fiduciary duty. Members of a corporate board owe a fiduciary duty to individual shareholders to treat them fairly and evenly. *See Schwartz v. Marien,* 37 N.Y.2d 487, 373 N.Y.S.2d 122, 125–28, 335 N.E.2d 334, 337–38 (1975); *Van Schaack Holdings, Ltd. v. Van Schaack,* 867 P.2d 892, 896–97 (Colo.1994); *Oberhelman v. Barnes Inv. Corp.,* 236 Kan. 335, 690 P.2d 1343, 1346–47 (1984). Because both the bank and the holding company were closely held, the fiduciary duty owed by the directors of the bank was similarly owed to the equitable shareholders of the holding company. *See Brown v. Tenney,* 125 Ill.2d 348, 126 Ill.Dec. 545, 549, 532 N.E.2d 230, 234 (1988) (the real owner of the subsidiary is not the holding company but rather the holding company shareholders).

■ We reject Rasmussen's claim that he could not owe a fiduciary duty to the shareholders of the holding company because he did not even know who they were. Under the circumstances the lack of knowledge is unusual, but the duty is owed to the group of shareholders, and it is not necessary to personally know the members of the group. *See Vista Fund v. Garis,* 277 N.W.2d 19, 22 n. 3 (Minn.1979); *Garner v. Pearson,* 374 F.Supp. 580, 586 (D.Fla.1973) ("This duty would be a duty owed by directors (in Bancorp) to the shareholder (B–A Bank) of its parent (Holdings)").

## III

■ Donohoo argues that even if there was a breach of a fiduciary duty, the Wenzels may not recover anything because they were not damaged. We disagree. The value of the Wenzels' majority interest in the bank is established by the agreement the Wenzels were negotiating with James Stolpestad and Eldon Rance. Stolpestad and Rance were willing to purchase the Wenzels' interest for $500,000 despite their knowledge of the holding-company's substantial debt to Midwest Federal. Donohoo and Mathies themselves had purchased 25% of the holding company's shares despite the Midwest Federal debt.

The record does not support Donohoo's argument that because of the Midwest Federal debt, the Wenzels were not damaged when they lost majority interest in the bank.

We also find no support for Donohoo's argument that the Stolpestad negotiations were rejected by the district court as a proper measure of recovery. The district court judge stated only that the Wenzels were not entitled to those damages "over and above any claim for lost profits and benefits." In addition to the Stolpestad agreement, the jury may have based its award of damages on the Wenzels' lost opportunity to purchase new shares of stock at half price from the bank.

Donohoo, a holding-company shareholder himself, argues that the Wenzels could not have escaped the holding company's liability to Midwest Federal. We see no reason why the Wenzels, like Donohoo, could not have joined in the questionable circumvention of liability by purchasing, as Donohoo did, the shares directly.

## IV

■ Even though the jury found no liability on the part of Capital Bank, the district court granted the Wenzels' judgment notwithstanding verdict motion, and held the bank vicariously liable. The district court based its order on the jury's finding that Mathies, Rasmussen, and Donohoo were acting within the scope of their employment with the bank when they breached their fiduciary duty to the Wenzels. *Orwick v. Belshan*, 304 Minn. 338, 343, 231 N.W.2d 90, 94 (1975) (court may partially direct a verdict to reconcile jury's special verdict answers).

The bank proposes to reconcile the jury's conflicting findings by concluding that the jury based its findings on Donohoo and Mathies' capacity as pledgors. This proposed reconciliation fails for two reasons: first, the jury explicitly found that Donohoo, Rasmussen, and Mathies were acting as officers of Capital Bank when they breached their fiduciary duties; second, in addition to assessing damages against the "pledgors," the jury assessed damages against Rasmussen who was not a pledgor, but only an officer of the bank.

The bank benefitted from the infusion of capital brought by the new shares. This fact, coupled with the jury's finding that Donohoo and Rasmussen were acting within the scope of their employment with the bank, sufficiently justifies the district court's order for JNOV.

## V

■ Donohoo alleges error in five separate jury instructions. Trial courts are allowed considerable latitude in selecting the language in jury instructions. *Alholm v. Wilt*, 394 N.W.2d 488, 490 (Minn.1986). An appellate court will not reverse a district court's decision unless the instructions constituted an abuse of discretion. *Id.* "It is unnecessary that every possible opportunity for misapprehension [by the jury] be guarded against." *Seivert v. Bass*, 288 Minn. 457, 467, 181 N.W.2d 888, 894 (1970).

■ Donohoo first objects to an instruction to consider, in determining wrongfully obtained profits, the amounts obtained in the sale of shares to Lloyd Amundson for any shares that should have been offered to the Wenzels. Donohoo argues that damages should be awarded only to the extent necessary to compensate a plaintiff for injuries sustained from the acts of a defendant.

In cases of wrongdoing, courts often award the profits gained by the wrongdoer as a method of deterrence. *See, e.g., Estate of Jones v. Kvamme*, 449 N.W.2d 428, 432 (Minn.1989); *see also Janigan v. Taylor*, 344 F.2d 781, 786 (1st Cir.1965) (profits may be considered even when it is speculative that plaintiffs would actually have profited in same way had they retained stock), *cert. denied*, 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120, (1965). Although there will be cases in which profits do not equal damages, this is not such a case. The new purchaser's profits are a fair and reasonable measure of the Wenzels' damages. The district court did not err in giving this instruction.

■ Next, Donohoo argues the district court erred by instructing the jury that the holding company and the bank must be considered the same enterprise. Because of the closely-held nature of both the holding com-

pany and the bank, and because the case was tried on a theory of unjust enrichment, the district court did not err by using the instruction.

■ Donohoo argues that the jury should not have been instructed on unjust enrichment because issuance of the stock was not illegal, as evidenced by the Department of Commerce's approval. This argument is without merit. Unjust enrichment is not limited to illegal conduct. *See Brand v. Williams,* 29 Minn. 238, 239, 13 N.W. 42, 42 (1882) (unjust enrichment is implied from having another's money, which in equity and good conscience must be returned); *Wilson v. Skogerboe,* 379 N.W.2d 696, 699 (Minn. App.1986) (unjust enrichment arises from a breach of confidential or fiduciary relationship).

■ The Department of Commerce gave its approval without knowing that the bank's current shareholders had not been given notice. Moreover, the stock was issued despite the FDIC's warning that it might violate "change of control" regulations.[1] For the same reasons, it was not error for the district court to instruct the jury to disregard the regulatory approval.

■ Donohoo challenges the instruction on the Wenzels' foreclosure as one-sided. The court told the jury that they would have to decide whether Donohoo and Mathies were aware of the foreclosure and whether the holding company's shares would revert to the Wenzels. Donohoo acknowledged in his own testimony that in the fall of 1985 he knew that Heaton was late in making his payments and that he had received a document clearly stating that Heaton was in default and that the Wenzels intended to foreclose. In light of this testimony, the instruction was more than fair.

■ Finally, Donohoo complains that the court improperly refused to instruct the jury that Donohoo, as chief executive officer of the

holding company, had the authority to vote its shares. The issue was not whether Donohoo had the authority to vote the shares, but whether he violated a fiduciary duty in voting them as he did. The requested instruction would not have helped the jury resolve that issue and might have given the jury the erroneous impression that Donohoo could vote the shares without regard to his fiduciary duty to the holding company and its shareholders.

## VI

■ The Wenzels appeal the district court's restriction of their remedy and assert that they should be entitled to all profits realized by the purchasers of the new bank shares, or in the alternative, should be given the opportunity to purchase the new shares at the original sale price.

■ Courts have broad discretion in fashioning remedies. *Cherne Indus., Inc. v. Grounds & Assocs., Inc.,* 278 N.W.2d 81, 92 (Minn.1979); *City of Cloquet v. Cloquet Sand & Gravel, Inc.,* 312 Minn. 277, 279, 251 N.W.2d 642, 644 (Minn.1977); *Beliveau v. Beliveau,* 217 Minn. 235, 245–46, 14 N.W.2d 360, 366 (Minn.1944); *see also Pooley v. Mankato Iron & Metal, Inc.,* 513 N.W.2d 834, 837–38 (Minn.App.1994) (courts may fashion equitable remedies to accomplish justice on facts of each case), *review denied* (Minn. May 17, 1994). Although a different remedy may have been allowed, the court did not abuse its discretion. This is particularly true on these facts because the profit being divided partly resulted from Midwest Federal's failure or inability to protect its security. Of the $4 million Amundson paid for the bank, Midwest Federal (whose note had been secured by 99.04% of the bank's shares) received only $1.1 million of the over $6 million owed by the bank's holding company. The new investors received the remaining $3 million for shares they purchased for $1 million.

1. On appeal Capital Bank petitioned to supplement the record with a final decision of the FDIC Board of Governors. The decision addresses the issuance of the 7,000 new shares and examines whether the transaction violated Federal Banking Act provisions. This decision was issued more than a year after the district court trial concluded. Because the decision is not evidence produced or received by the district court, we decline to make the decision a part of the record on appeal. *See* Minn.R.Civ.P. 110.01; *Thiele v. Stich,* 425 N.W.2d 580, 582 (Minn.1988). We note, however, that it is a reported case, available for review.

The jury was asked in the special verdict form what amount of money would adequately compensate the Wenzels. We find no abuse of discretion in this remedy.

## VII

 We also reject the Wenzels' claim to prejudgment interest. The Wenzels assert that a 1984 legislative change in Minn. Stat. § 549.09 allows prejudgment interest in unliquidated damage cases. 1984 Minn. Laws ch. 399, § 1; *see Lienhard v. State,* 431 N.W.2d 861, 865 (Minn.1988). Although *Lienhard* provides some authority for their argument, the language in *Lienhard* did not change the rule that prejudgment interest on unliquidated damages is available only when damages are readily ascertainable by computation and not dependent on contingencies or jury discretion. *See, e.g., ZumBerge v. Northern States Power Co.,* 481 N.W.2d 103, 109 (Minn.App.1992), *review denied* (Minn. Apr. 29, 1992); *International Fin. Servs., Inc. v. Franz,* 515 N.W.2d 379, 389 (Minn. App.1994), *aff'd in part and rev'd in part on other grounds,* 534 N.W.2d 261 (Minn.1995); *see also Dear v. Minneapolis Fire Dept. Relief Ass'n,* 481 N.W.2d 69, 73 (Minn.App. 1992), *aff'd as modified,* 485 N.W.2d 145 (Minn.1992). The Wenzels' damages were not liquidated and were clearly dependent on jury discretion. The district court did not err in denying prejudgment interest.

## VIII

While this action was pending, the district court issued a TRO enjoining Capital Bank and its directors from transferring or concealing any of the funds received from the sale of stock to Amundson until further order. The district court also ordered disclosure of the amounts received from the sale and the "current repository" of the funds. The court added a handwritten provision ordering the Wenzels to post a $10,000 bond. Contrary to Donohoo's arguments, the TRO was not expressly conditioned on the bond. The court subsequently allowed a return of the bond, but maintained the TRO in full force and effect.

Although the record is sketchy, the Wenzels apparently subpoenaed Donohoo to appear at a deposition for the purpose of revealing the "current repository" of the funds. When Donohoo did not appear at the deposition or a subsequent hearing, the court found him in contempt. In its contempt order, the court stated the purpose of the TRO was to "provide a source of recovery" for the Wenzels if they prevailed at trial. The court had already entered judgment for the Wenzels against Donohoo for $500,000. Donohoo never disclosed the location of the funds from the sale of stock and did not pay the $500,-000.

Finding him in contempt, the court ordered Donohoo imprisoned until he complied with the TRO by paying $500,000 to the Wenzels. The court stayed the contempt order and scheduled a further hearing, but Donohoo still did not appear, and the district court reinstated the contempt order.

 Donohoo raises several arguments in support of his contention that the TRO and contempt order are invalid. Although not all of the arguments are persuasive, we agree that the adequacy of the Wenzels' legal remedies under the Minnesota attachment provisions precludes a restraining order. *See All-state Sales & Leasing Co. v. Geis,* 412 N.W.2d 30, 32 (Minn.App.1987). Three grounds for attachment apply: (1) when a party did or is about to transfer or dispose of its property with the intent to delay or defraud its creditors; (2) when a party removed or is about to remove property from this state to delay or defraud creditors; and (3) when a party converted its property into money or credits to avoid its creditors. Minn.Stat. § 570.02, subd. 1(1)–(3) (1994).

 In addition, a person must appear before the court, voluntarily or involuntarily, for examination before being held in constructive civil contempt. Minn.Stat. § 588.09 (1994); *Clausen v. Clausen,* 250 Minn. 293, 297, 84 N.W.2d 675, 679 (1957); *Westgor v. Grimm,* 381 N.W.2d 877, 879–80 (Minn.App.1986). This requirement remains even if the individual repeatedly fails to appear before the court. *Id.* The court scheduled several hearings to consider the Wenzels' motion to hold Donohoo in contempt, but Donohoo did not appear. Thus, the re-

quirements of a contempt order were not met in this case.

## DECISION

The district court's entry of judgment against Donohoo, Rasmussen, and Capital Bank is affirmed; the temporary restraining order is dissolved; and the contempt order is vacated. The district court's denial of pre-judgment interest and its remedy for the breach of fiduciary duty are affirmed.

**Affirmed in part, reversed in part, motion denied.**