No. 95-3203

Lindquist & Vennum,                      *
                                         *
                   Petitioner,           *
                                         *
          v.                             *
                                         *
Federal Deposit Insurance  *
Corporation,                             *
                                         *
                   Respondent.           *


No. 95-3226

Wayne Field,                             *
                                         *
                   Petitioner,           *
                                         *
          v.                             *   PETITIONS FOR REVIEW OF FEDERAL
                                         *   DEPOSIT INSURANCE CORPORATION.
Federal Deposit Insurance  *
Corporation,                             *
                                         *
                   Respondent.           *


No. 95-3256

Richard D. Donohoo, Craig R.             *
Mathies, Cheryl C. Godbout-              *
Bandal,                                  *
                                         *
                   Petitioners,          *
                                         *
          v.                             *
                                         *
Federal Deposit Insurance  *
Corporation,                             *
                                         *
                   Respondent.           *

No. 95-3284

Bruce A. Rasmussen, Bruce A.            *
Rasmussen & Associates, Ltd.,           *
                                        *
            Petitioners,                *
                                        *
      v.                                *
                                        *
Federal Deposit Insurance  *
Corporation,                            *
                                        *
            Respondent.        *

                  Submitted:  October 21, 1996

                  Filed:  January 8, 1997

Before FAGG, HEANEY, and HANSEN, Circuit Judges.

HEANEY, Circuit Judge.

        Petitioners seek review of an order of the Federal Deposit Insurance Corporation (FDIC) prohibiting Richard D. Donohoo and Craig R. Mathies from further participation in the banking industry; directing all petitioners to cease and desist from violating the Change in Bank Control Act of 1978 (CBCA), 12 U.S.C. § 1817(j) (1988), and engaging in self-dealing and insider transactions; ordering the individual petitioners to pay civil monetary penalties for statutory and regulatory violations; and ordering petitioners to reimburse Capital Bank for legal fees paid to two law firms on behalf of the individual petitioners.  Petitioners describe their activities as an honest effort to save Capital Bank through recapitalization.  The FDIC characterizes the effort as a devious attempt to gain control of Capital Bank at the expense of the majority shareholders in violation of the CBCA and Regulation O.  Petitioners, who claim that the FDIC's determination

2

was based on an improper interpretation of federal law and unsupported by the record, may be treated essentially as two sets of parties: five individuals who played various roles in Capital Bank and the sale of shares in the bank (individual petitioners); and two law firms that advised the individual petitioners in the sale of the Capital Bank shares and represented the bank in a subsequent lawsuit arising from the sale (law firm petitioners). We enforce the portion of the FDIC's decision and order that imposes sanctions on the individual petitioners for unsafe and unsound banking practices and that requires petitioner Rasmussen to pay the outstanding balance and interest on a loan from People's Bank. We modify the order as it applies to reimbursement to Capital Bank for legal fees in the Wenzel Lawsuit, and deny enforcement of the order as it applies the FDIC's cease-and-desist authority to the law firm petitioners.

## I.  STANDARD OF REVIEW

We review the order of the FDIC pursuant to the Administrative Procedure Act (APA), 5 U.S.C. § 706 (2) (1988), and enforce the order if the FDIC made no errors of law and if its findings of fact are supported by substantial evidence on the record as a whole. Oberstar v. FDIC, 987 F.2d 494, 503 (8th Cir. 1993). We review issues of law de novo. Seidman v. OTS, 37 F.3d 911, 924 (3d Cir. 1994). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994). We may not substitute our judgment for that of the FDIC. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971). If an agency considered a recommendation by an Administrative Law Judge (ALJ), we review the ALJ's recommendation as part of the record and require an agency to show that it gave the recommendation "attentive consideration" if the agency departs from it. Simon v. Simmons Foods, Inc., 49 F.3d 386, 389-90 (8th Cir. 1995).

## II. UNSAFE AND UNSOUND BANKING PRACTICES

### A. Change in Bank Control Act Violations

We consider first whether the individual petitioners violated the CBCA by acting in concert in the issuance and purchase of 7,000 new shares of Capital Bank without obtaining prior regulatory approval. The CBCA provides:

> **(1)** No person, acting directly or through or in concert with one or more persons, shall acquire control of any insured depository institution through a purchase . . . of voting stock of such insured depository institution unless the appropriate Federal banking agency has been given sixty days' prior written notice of such proposed acquisition . . . .

12 U.S.C. § 1817(j)(1). The control of a bank is "the power, directly or indirectly, to . . . vote 25 per centum or more of any class of voting securities of an insured depository institution." 12 U.S.C. § 1817(j)(8)(B). The FDIC found that all of the petitioners violated the CBCA.

### 1. Petitioners Donohoo, Mathies, Godbout-Bandal, and Rasmussen

Donohoo and Mathies were the primary actors in the issuance, sale, and purchase of the new Capital Bank shares and the subject of the FDIC's prohibition order. The ALJ found that in May 1988, they purchased 24.9% of the outstanding stock of Capital Bank's holding company, Capital City Corporation (CCC) from George Heaton. Heaton had purchased 99% of CCC from the Wenzel family in 1981 for consideration that included an $800,000 note Heaton was obligated on to the Wenzels (Wenzel note). In addition to the shares, Donohoo and Mathies purchased an option to buy the rest of Heaton's CCC shares for $1,025,000, financed by loans of $500,000 from Midway Bank (Midway loan) and $127,680 from People's State Bank in Winthrop, Iowa, and by assuming $400,000 liability on the Wenzel

4

note.  Following the purchase, Donohoo and Mathies became directors and officers of both CCC and Capital Bank.  By January 1989, Donohoo and Mathies controlled Capital Bank's board of directors after replacing the previous directors with their own selections.  Godbout-Bandal became involved in the effort to gain control of the bank as an investor in the attempt by Donohoo and Mathies to purchase a majority interest in CCC in 1988 and 1989.  Rasmussen was a director, executive officer, and principal shareholder of Capital Bank.

We believe that, with respect to the individual petitioners, the FDIC properly interpreted the CBCA, and substantial evidence on the record as a whole supports the FDIC's finding that individual petitioners acquired control of Capital Bank through a concerted effort in violation of the CBCA.  The percent of Capital Bank's shares acquired by petitioners in sum exceeded the statutory definition of control.[1]  The individual petitioners argue that there is no evidence of their "acting in concert" to acquire control of the bank because there was no formal agreement between them-- such as a proxy assignment, purchase and sale agreement, voting agreement, cross-pledge, collateral guaranty, or cross-guaranty--and because the individual petitioners did not all know every other investor.  These findings are not prerequisites for a determination that the group acted in concert.  Even absent a formal agreement, the shares of individuals may be considered together for determining control.  FDIC v. Annunzio, 524 F. Supp. 694, 699 (N.D. W.Va. 1981);  see also Wellman v. Dickinson, 682 F.2d 355, 363 (2d Cir. 1982) (to find concerted effort, an agreement need not be written and may be informal, and group activity may be proven circumstantially); SEC v. Savoy Indus., 587

---

[1]Donohoo and Mathies purchased 2,100 shares or 15.2% of the bank's shares.  Field and Godbout-Bandal each bought 2,100 shares or 15.2%.  Rasmussen purchased the remaining 700, which equalled approximately 5%.  In total, the group purchased approximately 50.6% of the bank's outstanding shares.

5

F.2d 1149 (D.C. Cir. 1978). Further, persons acting in concert need not know each other. <u>Blumenthal v. United States</u>, 332 U.S. 539, 557 (1947). Not only would petitioners' approach contradict statutory support for findings based on circumstantial evidence, it would also limit the effect of the CBCA to only the least sophisticated perpetrators of illegal bank takeovers.

Evidence supporting the FDIC's conclusion that the individual petitioners worked in concert abounds. Beginning in May 1988, Donohoo and Mathies established the investment group that included Godbout-Bandal and Rasmussen to finance the exercise of their CCC stock options, and the money invested came primarily from loans to the investors from Capital Bank. When foreclosure on the loan for which Capital Bank's stock served as collateral could not be stalled any longer, Donohoo and Mathies decided to issue new stock in Capital Bank and sell it directly to the members of their investment group. Donohoo and Mathies knew all of the participants in the plan prior to its genesis. Although the previous, unsuccessful effort by individual petitioners to acquire Capital Bank's holding company would not support a finding of concerted effort by itself, combined with other evidence on the record,[2] it provides circumstantial evidence of the group's intent to gain control of Capital Bank. <u>See</u> <u>Wellman</u>, 682 F.2d at 363; <u>cf.</u> <u>Herman & MacLean v. Huddleston</u>, 459 U.S. 375, 390 n.30 (1983) ("circumstantial evidence can be more than sufficient" in civil cases).

---

[2]Petitioners called their effort to purchase Capital City Corporation "Capital Partners." Capital Partners is also the title of a demand deposit account at Midway used by Mathies and Donohoo to deposit investments made by the group and to make payments on the Midway loan and the Wenzel note. Although petitioners argue the naming of the account had no significance, the FDIC found that the name and use of the account showed a common scheme among the investors, who surely intended to get something in return for their financial contributions. The Capital Partners Account accompanies a volume of evidence supporting the FDIC's findings.

Donohoo's acknowledgement that the CBCA applied to the Capital Partners effort and his statement that the group had "gotten together" to save Capital Bank through the stock issuance and purchase[3] further reveal that individual petitioners intended to act in concert to acquire control of the bank. Most of the individual petitioners accepted financing from Capital Bank or its affiliates, which were controlled by Donohoo and Mathies, in close proximity to their purchases of "investment units" in Capital City Corporation from Donohoo and Mathies.[4] Prior to the sale of the 7,000 new Capital Bank shares, the FDIC indicated its belief that the group was acting in concert, and warned individual petitioners

_____

[3]On December 28, 1989, Donohoo advised the FDIC by letter of his plan to recapitalize Capital Bank once the "change in control has been approved" under the provisions of the CBCA. (Letter from Donohoo to the FDIC (December 28, 1989).) While testifying at the administrative hearing, Donohoo indicated that they were "[a]cting together," (Trial Tr. at 1573), and described the stock purchasers as "a group of guys that have gotten together" to "save" the bank, (Trial Tr. at 1475-76.) In addition, documentary evidence obtained from a loan file at Midway Bank showed that Donohoo and Mathies advised Midway that they had a group of investors who were interested in purchasing control of Capital Bank.

[4]On November 18, 1988, Capital Bank loaned $76,000 to Leonard C. Misenor's parents. The same day, Misenor, who was an executive officer of Capital Bank, transferred $73,000 to Donohoo and Mathies for an "investment unit." Misenor is not a petitioner in this action. Charges against Misenor were withdrawn following a settlement between Misenor and the FDIC.
On December 20, 1988, Brooks Hauser purchased an investment unit for $50,000. Four days later, Capital Bank renewed a $400,000 loan to Hauser, who was a director of Capital Bank. On January 20, 1989, the bank's board, Donohoo, Mathies, Rasmussen, and Hauser, reaffirmed a $650,000 line of credit for Hauser. The next Monday, Hauser transferred $96,000 to Donohoo and Mathies for an investment unit. Hauser is not a party to this action. Hauser did not participate in the issuance, sale, and purchase of the new Capital Bank shares because he had consented to an order prohibiting him to participate in the affairs of a federally-insured financial institution issued by the Office of Thrift Supervision in early 1990.
Several other improper loans were made to the members of the Capital Partners group, particularly to the individual petitioners in this case. See infra note 8 and Part II.B.1.

that their purchase of the shares would violate the CBCA. Nonetheless, they proceeded with the purchase. Moreover, after the individual petitioners held the new shares for almost two-and-a-half years, they sold the shares collectively as a "majority interest," making a substantial profit.[5]

Individual petitioners alternatively argue that they are shielded from liability for CBCA violations by their reliance on counsel's advice in proceeding with the purchase of the new Capital Bank shares despite the FDIC's warning. This argument similarly fails. A person may not willfully and knowingly violate the law and escape liability by claiming to have followed the advice of counsel. Williamson v. United States, 207 U.S. 425, 453 (1907); United States v. Poludniak, 657 F.2d 948, 959 (8th Cir. 1981). Although petitioners argue that they did not act willfully or knowingly in violating the CBCA, the record supports the FDIC's finding that petitioners were aware of the illegality of their actions after receipt of a clear warning of the FDIC's position that the stock purchase violated the CBCA.

Petitioners also contend that they should escape punishment entirely or receive de minimis sanctions for CBCA violations because they acted to save Capital Bank and saved taxpayers millions of dollars. This argument does not relate to whether the FDIC properly found CBCA violations. The requirements of the CBCA are straightforward. The condition of a bank or the motives of prospective stock purchasers may be relevant in determining whether to grant approval for a change in control of the bank, but they do not bear on the issue of whether the provisions of the CBCA were violated.

---

[5]Donohoo and Mathies each realized a gain of $925,554, Rasmussen made $23,608, Godbout-Bandal made $120,800, and Field made $295,012.

Finally, individual petitioners claim that they should be spared sanctions for their conduct because they paid a fair price for the Capital Bank shares and because they offered to rescind the transaction when the FDIC indicated it would challenge the purchase. Although the FDIC found that individual petitioners paid less than book value for the shares,[6] the finding is irrelevant as to whether petitioners violated the CBCA. Likewise, the fact that petitioners offered to reverse the stock sale and purchase provides no additional pertinent information other than to demonstrate that petitioners were belatedly willing to appreciate the legal determination of the FDIC after the threat of sanctions became imminent.

## 2. Petitioner Field

Petitioner Wayne C. Field separately appeals from the order of the FDIC. Field, like Godbout-Bandal, was an investor in the attempted takeover of CCC prior to his purchase of new shares of Capital Bank. He claims that, regardless of whether the other individual petitioners violated statutory or administrative regulations, the FDIC had no basis for finding that he had done so. Field argues that because his role in the matter was simply that of an innocent investor, he was not guilty of violating the CBCA. We uphold the FDIC's order with respect to Field.

Reviewing the FDIC's order under the same standard as articulated above, the record on the whole provides enough evidence to support the FDIC's finding that Field participated in the effort to gain control of Capital Bank in violation of the CBCA. The FDIC

---

[6]The 7,000 shares of new stock were issued on July 30, 1990. The price was $142.86 per share. As of that date, the book value of the then outstanding stock was $328.71 per share. Immediately after the issuance of these new shares, the value of the existing shares was reduced to $231 each, while the value of the newly issued stock increased to $231 per share.

9

adopted the ALJ's findings that Field had extensive experience in banking, that he was aware of the CBCA, and that he knew that the acquisition of the bank was subject to regulatory approval. Statements by Field recognizing the CBCA's applicability to the transaction strongly support those conclusions.[7] The FDIC also relied on evidence of Field's participation in previous attempts by Donohoo and Mathies to gain control of Capital Bank and acceptance of improper loans from the bank in the process.[8] Moreover, Update Reports from Capital Bank and other correspondence between petitioners gave Field notice that the group would be purchasing a majority of Capital Bank's shares and that such a purchase would require administrative approval.

---

[7]In a September 14, 1989 letter to Leonard Misenor, Mr. Field stated:

> As to my investment in Capital Bank stock this is subject to the Change of Control of ownership in the Bank, I made an investment at the time, if control is approved I expect to be issued stock.

(Letter from Wayne Field to Leonard C. Misenor (Sept. 14, 1989).)

[8]On November 14, 1988, the day before Midway Bank would have foreclosed on Capital Bank for a default on the Midway loan, Field took out a $256,000 loan from Capital Bank. He then transferred $73,000 to Donohoo and Mathies for an investment unit.

On April 7, 1989, Field borrowed an additional $434,000 from Capital Bank, including $234,000 to renew his previous loan and a $200,000 advance. The same day he transferred $60,000 to Donohoo and Mathies for an investment unit.

**B. REGULATION O VIOLATIONS AND OTHER UNSAFE AND UNSOUND BANKING PRACTICES**

In addition to violating the CBCA, the FDIC found that the individual petitioners violated Regulation O[9] by obtaining insider loans on several occasions and that the loans were made on preferential terms with inadequate collateral and with an above-normal repayment risk. It also found that Capital Bank's board of directors, controlled by Donohoo and Mathies, authorized employment agreements and bonus payments for Donohoo and Mathies that constituted unsafe and unsound banking practices and exposed Capital Bank to substantial losses. It finally found that Donohoo and Mathies made false statements to bank examiners.

**1. Insider Loans**

---

[9]Regulation O provides guidelines that apply to a bank's loans to insiders to prevent insider abuse of bank funds. It requires that insider loans be made on the same terms as extensions of credit to other bank customers, that they be approved by a majority of the disinterested members of the bank's board, and that they meet other restrictions. Regulation O is codified chiefly at 12 U.S.C. § 375b and 12 C.F.R. pt. 215. Section 375b provides in part:

> **(2)** No member bank shall make any loan or extension of credit in any manner to any of its executive officers or directors, or to any person who directly or indirectly or acting through or in concert with one or more persons owns, controls, or has the power to vote more than 10 per centum of any class of voting securities of such member bank . . . unless such loan, line of credit, or extension of credit is approved in advance by a majority of the entire board of directors with the interested party abstaining from participating directly or indirectly in the voting.

12 U.S.C. § 375b(1) (1988).

11

After careful review, we believe the FDIC's findings that individual petitioners caused to be made and accepted insider loans

are supported by substantial evidence on the record as a whole. Regulation O at 12 C.F.R. § 215.4 specifically provides that a bank may not extend credit to officers, directors, or principal shareholders unless the extension of credit is "made on substantially the same terms . . . as, and following credit underwriting procedures that are not less stringent than, those prevailing at the time" for other persons. 12 C.F.R. § 215.4 (1988). In addition, the loan must be approved by a majority of the disinterested directors. Id.

The FDIC found that a November 18, 1988 loan to Leonard Misenor, an officer of Capital Bank, was not made on substantially the same terms as loans to others and that the proceeds were then used for Donohoo's and Mathies' benefit to reduce their indebtedness on the Midway loan and the Wenzel note. Moreover, no provision was made for periodic payment of principal, the collateral was inadequate, and the proceeds were not used for the intended purposes.

The FDIC found that an unsecured loan to Bruce A. Rasmussen in the sum of $100,000 by People's Bank, which was controlled by Donohoo, violated Regulation O because it exceeded five percent of the capital and unimpaired surplus of People's Bank and did not receive prior approval of a majority of the People's Bank Board of Directors. It further found that the proceeds of the loan were used to purchase stock in Capital Bank and that this purchase benefited Donohoo.

The individual petitioners concede that a July 25, 1990 loan to the Pentagon Parks Association (PPA) in the sum of $480,000, of which $200,000 was used by Godbout-Bandal to finance her purchase of stock in Capital Bank, violated section 215.4(a)(1) of Regulation O. They assert, however, that any penalty should be de minimis because the violation was inadvertent, resulted in no loss to Capital Bank, and was immediately corrected. They also urge us

13

to consider the lack of any history of similar violations by Godbout-Bandal.  The FDIC found that the loan to PPA violated the CBCA through attribution to Donohoo and Mathies and constituted an unsound and unsafe banking practice as an attempt to use capital from Capital Bank to give the bank a capital infusion.

The FDIC found that loans to Field violated section 215.4(b) of Regulation O because each of the loans exceeded five percent of Capital Bank's capital and unimpaired surplus, did not receive prior approval of a majority of the board of directors, and were used for purposes other than stated in the credit file--to purchase stock in Capital Bank.  Field's argument that he was only drawing on an existing line of credit is not supported by the record.  The only evidence supporting the existence of a line of credit was Field's own testimony and a letter referring to an expired line of credit to Field.  Moreover, Field had insufficient funds in his accounts at the time of his purchases of CCC investment units without the infusion of funds from Capital Bank.

### 2.  Employment Agreements and Bonuses

We believe that the FDIC finding that Donohoo, Mathies, and Rasmussen engaged in unsafe and unsound banking practices in creating employment agreements and bonuses for Donohoo and Mathies was supported by substantial evidence on the record as a whole.  On May 25, 1989, the Capital Bank board of directors--consisting of Donohoo, Rasmussen, and Brooks Hauser--authorized employment agreements with Donohoo and Mathies.  Among other provisions, the original agreement and its amendments required Capital Bank to pay Donohoo and Mathies an amount equal to twice their highest annual salary plus bonuses and benefits if they were terminated for any reason other than breach of fiduciary duty.  The agreements also required Capital Bank to pay them a total of $370,000 upon change in control of the bank. The agreement, after its amendment, exposed the bank to a potential liability of $630,000 or 22% of the

14

bank's capital.  On July 13, 1990, Donohoo and Mathies caused Capital Bank to pay each of them a bonus of $10,000.  The bonuses were not authorized by the board of directors of the bank and were used by Donohoo and Mathies to help fund their purchases of stock in the bank.

### 3.  Misrepresentations to Bank Examiners

We believe substantial evidence on the record as a whole supports the FDIC finding that Donohoo and Mathies intentionally deceived federal and state bank examiners with respect to the purpose, use, and terms of a loan transmitted to Leonard Misenor in their effort to obtain control of CCC. The FDIC found that Donohoo knew the purpose and use of the loan, as well as the preferential terms given to Misenor; and he omitted the loan from its proper reporting locations on the Officer's Questionnaire associated with the 1989 examinations of Capital Bank's operations.  Further, the FDIC found that both Donohoo and Mathies allowed Misenor to misrepresent the purpose of the loan to FDIC examiners on two occasions and improperly assisted Misenor in improving the condition of the loan to avoid a "substandard" rating for bank examination purposes.

## C.  THE FDIC SANCTIONS

Based on the violations it found, the FDIC ordered each of the individual petitioners to pay civil money penalties, prohibited Donohoo and Mathies from participating in future banking activities, and assessed other penalties.[10]  We hold that the findings of the FDIC on these matters are supported by substantial

---

[10]The FDIC also directed the individual petitioners to cease and desist from violating the CBCA and engaging in self-dealing and ordered them to reimburse Capital Bank for legal fees paid to Lindquist & Vennum and Rasmussen & Associates on behalf of the individual petitioners.

evidence on the record as a whole and that the remedies imposed on the individual petitioners are within the informed discretion of the FDIC.

Our circuit has recognized that Congress strengthened the FDIC's already strong enforcement powers in the Financial Institutions Recovery, Reform and Enforcement Act of 1989, Pub. L. No. 101-73, 103 Stat. 183 (1989) (FIRREA).  Oberstar v. FDIC, 987 F.2d 494, 499 (8th Cir. 1993). Through its congressionally granted powers, the FDIC may prohibit further participation in the banking industry if an institution-affiliated party has:  (1) violated a law, regulation, cease-and-desist order, or participated in an unsafe or unsound practice or breached a fiduciary duty; (2) as a result, exposed a bank to financial loss, caused prejudice to the bank's depositors, or received financial or other benefits; and (3) committed the violation, practice, or breach with personal dishonesty or a willful or continuing disregard for the safety or soundness of the bank. 12 U.S.C. § 1818(e)(1) (1988).  The FDIC may also impose significant civil monetary penalties on institution-affiliated parties for violations based on the gravity of the violation and other limitations.  12 U.S.C. § 1818(i)(2)(A)-(D) (1988).

### 1.  The Prohibition Order

To support its order prohibiting Donohoo and Mathies from further participation in the banking industry, the FDIC must show substantial evidence of their misconduct, the harm or threat of harm to the banking institution, and culpability on the part of the prohibited parties.  The FDIC's above findings, which are properly supported by the record, demonstrate that Donohoo and Mathies engineered an effort illegally to gain control of a federally-insured bank.  Moreover, in their effort, Donohoo and Mathies participated in several Regulation O violations and other unsafe

and unsound banking practices, many of which were designed to profit them directly.

The record properly supports the findings that Donohoo and Mathies were aware of the wrongfulness of their actions and disregarded the likely detrimental effect on Capital Bank.  Therefore, the FDIC's prohibition order with respect to Donohoo and Mathies was authorized under 12 U.S.C. § 1818(e).

**2.  The Cease-and-Desist Order**

Under 12 U.S.C. § 1818(b)(1), the FDIC may order a qualified party to cease and desist from activities that are unsafe and unsound with respect to a federally-insured bank, or from violating other laws or FDIC orders.  As our circuit has recognized, the FDIC need only show proof of misconduct to exercise its power to order a party to cease and desist from that misconduct.  Oberstar, 987 F.2d at 502.  We believe that, after conducting the proper procedures for notice and hearing under the statute, the FDIC properly issued the cease-and-desist order with respect to all of the individual petitioners.

With respect to the law firm petitioners, we do not find substantial evidence on the record as a whole to support the FDIC's finding that the law firm petitioners acted knowingly or recklessly in the commission of unsafe and unsound banking practices.  On the contrary, the scant evidence on this issue shows that the attorney for Capital Bank was without knowledge of critical facts or deliberately misled about those facts when issuing his advice regarding the transactions related to this action.  We therefore refuse to enforce the FDIC's cease-and-desist order as it relates to the law firm petitioners.

**3.  The Civil Monetary Penalties**

17

The FDIC's authority to impose civil monetary penalties on institution-affiliated parties of up to $1,000,000 per day rises from three statutory provisions. The provisions differentiate the FDIC's ability to impose sanctions based on the level of culpability properly attributed to the offending party. Under 12 U.S.C. § 1818(i), the FDIC is empowered to impose monetary penalties generally. Violators of the CBCA may be assessed monetary penalties under 12 U.S.C. § 1817(j)(16), while violators of 12 U.S.C. § 375b and Regulation O may be similarly penalized under 12 U.S.C. § 1828(j)(4). After giving notice and conducting the proper hearing, the FDIC may assess civil monetary penalties for the above infractions, taking into account statutorily-recognized mitigating factors. See 12 U.S.C. § 1818(i)(2)(G).

The FDIC Board adopted civil monetary penalties that both required the individual petitioners to pay the amount each received from the illegal takeover of Capital Bank and a penalty recommended by the ALJ.[11] Despite various objections raised by the individual petitioners, we believe the FDIC properly considered all mitigating factors and properly calculated the amount of profit received by each individual petitioner. The penalties assessed by the FDIC are therefore substantially supported by evidence on the record as a whole and based on proper interpretations of the relevant statutory provisions.

### 4. Loan No. 4100-29836

The FDIC further ordered petitioner Rasmussen to pay the unpaid balance of and interest on Loan No. 4100-29836 drawn from

---

[11]The ALJ initially recommended that the individual petitioners reimburse Capital Bank for the profit they received on its stock. The FDIC Board properly determined that the reimbursement would provide an unwarranted windfall to the bank's new owner, and therefore ordered the amount of profit to be paid in civil monetary penalties.

People's Bank on July 30, 1990.  We believe the FDIC's findings are substantially supported by evidence on the record viewed as a whole, and its order is not arbitrary, capricious, or otherwise contrary to law.

**D.  THE WENZEL LAWSUIT**

The Lindquist & Vennum law firm represented Capital Bank in the issuance and sale of the 7,000 new Capital Bank shares.[12]  As a result of the issuance and purchase of the 7,000 new voting shares of the bank stock, the Wenzel family, who had a continuing financial interest in Capital Bank, brought an action in Minnesota state court against Donohoo, Mathies, and Rasmussen; the new investors, including Field and Godbout-Bandal; and Capital Bank for breach of fiduciary duty.  The law firm petitioners advised Capital Bank that payment of attorneys' fees by the bank in defense of itself and of the individual petitioners who had acted on behalf of Capital Bank was proper.  Both Lindquist & Vennum and Bruce A. Rasmussen & Associates accepted legal fees from Capital Bank for defending the bank and individual petitioners in the Wenzel lawsuit.

In the Wenzel suit, the jury found that Donohoo, Mathies, and Rasmussen had breached a fiduciary duty to the Wenzels; that the

---

[12]On July 30, 1990, Lindquist & Vennum gave an oral opinion to the bank's board of directors followed by a written opinion to the FDIC that the plan to issue the new shares would not violate the CBCA and no notice under that Act was necessary.  The law firm prepared the documents necessary to issue and sell the shares.  It was aware of the fact that the FDIC believed that the stock transaction would violate the CBCA, but did not change its advice to the bank or to the individual petitioners and did not advise the bank to file the required notices for a change in control.  On January 28, 1991, the FDIC notified the law firm that it was prepared to recommend that civil monetary penalties be assessed against the firm for violating the CBCA.  Notwithstanding the notification, the FDIC imposed no civil monetary penalties on Lindquist & Vennum for violating the CBCA.

19

three acted within the scope and course of their bank employment; and that Donohoo and Mathies, as stock pledgers, breached a separate duty to the Wenzels. The jury further found that the Wenzels were entitled to damages of $500,000 from Donohoo, $23,600 from Rasmussen, and no damages from Capital Bank.

Thereafter, the state court entered a judgment notwithstanding the verdict against Capital Bank, as well as Donohoo and Mathies, based on the jury's finding that Donohoo and Mathies acted within the scope of their employment with Capital Bank when they breached their duty to the Wenzels. The court further held Capital Bank vicariously liable to the Wenzels because the bank benefited from the infusion of capital resulting from the issuance and sale of the new shares. After the FDIC rendered its opinion that the indemnification by Capital Bank of the individual petitioners was improper, the Minnesota Court of Appeals affirmed the finding of joint and several liability against Donohoo, Rasmussen, and Capital Bank. It held that the jury's finding that Donohoo and Mathies were acting within the scope of their employment with the bank sufficiently justified the district court's order for judgment notwithstanding the verdict. The law firm petitioners represented all defendants before the state court and the appellate court with Capital Bank paying all attorneys' fees associated with the case.

On September 9, 1992, the FDIC issued notice of charges and a temporary cease-and-desist order prohibiting Capital Bank from indemnifying the individual petitioners in the Wenzel lawsuit, prohibiting the individual or law firm petitioners from accepting any proceeds from Capital Bank indemnifying the individual petitioners, and requiring the individual petitioners to reimburse Capital Bank for the bank's expenses incurred in defending itself in the Wenzel lawsuit. The individual and law firm petitioners filed an action in the United States District Court to stay the FDIC's temporary cease-and-desist order. The district court granted the stay only insofar as the order required the individual

20

petitioners to reimburse Capital Bank for the bank's expense in defending itself in the action.[13]

Following an evidentiary hearing, the ALJ in the FDIC proceedings recommended only that the law firm petitioners be ordered to cease and desist from representing Donohoo and Mathies on their counterclaims in the Wenzel lawsuit and to reimburse Capital Bank for any legal fees expended on the counterclaims. He refused to recommend that the law firm petitioners refund the legal fees that had been paid by Capital Bank for representation in the Wenzel lawsuit.

The FDIC rejected the ALJ's findings on this matter, however, finding that the law firm petitioners knowingly and/or recklessly participated in breaches of fiduciary duties and unsafe or unsound practices in connection with Capital Bank's indemnification of the individual petitioners and by accepting all legal fees and expenses from the Wenzel lawsuit solely from Capital Bank.[14] The FDIC ordered the law firm petitioners to refund all legal fees paid by Capital Bank. It based its decision on its finding that the law firm petitioners were "institution-affiliated parties" that had knowingly or recklessly participated in a violation of law that caused more

---

[13]The district court did not, however, prohibit the FDIC from ordering the individual petitioners to reimburse the bank after an administrative hearing on the issue. The court concluded that ordering the payments was improper in the context of a temporary order drafted ex parte.

[14]The legal fees paid by Capital Bank in the Wenzel lawsuit amounted to $260,866, including fees generated by the counterclaims brought by Donohoo and Mathies.

21

than a minimal financial loss to a bank.  12 U.S.C. § 1813(u)(4).[15]  The FDIC further found that the violation of law

---

[15]12 U.S.C. § 1813(u)(4) defines the term "institution-affiliated party" to include:

> (4) any independent contractor (including any attorney, appraiser, or accountant) who knowingly or recklessly participates in --
>     (A) any violation of any law or regulation;
>     (B) any breach of fiduciary duty; or
>     (C) any unsafe or unsound practice,
> which caused or is likely to cause more than a minimal financial loss to, or significant adverse affect on, the insured depository institution.

12 U.S.C. § 1813(u)(4)(1988).

22

involved an opinion of the law firm petitioners that indemnification of the individual petitioners by Capital Bank was proper without knowing or determining whether Capital Bank had complied with section 300.083 of the Minnesota Statutes.  Under that section, the determination of eligibility for indemnification must, under certain circumstances, be made by "special legal counsel."[16]  Minn. Stat. § 300.083, subd. 6(3) (1985).  The FDIC made no finding with respect to any other violations of law.

On appeal, the law firm petitioners primarily argue that the FDIC erred in holding that the law firm petitioners knowingly or recklessly violated a law or participated in breaches of fiduciary

---

[16]The statute provides:

All determinations whether indemnification of a person is required . . . and whether a person is entitled to payment or reimbursement of expenses . . . shall be made:

(3) (If a quorum of non-party directors, or a majority vote of two or more non-party members of a board committee designated by a majority of the board cannot be reached) by special legal counsel . . . .

Minn. Stat. § 300.083, subd. 6(a) (1985).  "Special legal counsel" is "counsel who has not represented the corporation or a related corporation, or a director, officer, employee, or agent whose indemnification is in issue."  Minn Stat. § 300.083, subd. 1(e) (1985).

duty and unsafe or unsound practices.[17]  The decision of the FDIC is premised on its belief that the real parties in interest in the Wenzel lawsuit were the individual petitioners rather than Capital Bank. Certainly the individual petitioners--particularly, Donohoo, Mathies, and Rasmussen--were real parties in interest.  Capital Bank, however, was also a defendant in the Wenzel action and, as the Minnesota state court determined, was subject to vicarious liability because Donohoo and Mathies acted within their scope of employment for the benefit of Capital Bank. Wenzel v. Mathies, 542 N.W.2d 634, 642 (Minn. Ct.App. 1996).  Although the FDIC issued its decision before the Minnesota Court of Appeals did, the fact remains that Capital Bank had been joined as a defendant in the Wenzel action, and the law firms reasonably determined that Capital Bank could be subject to joint and several liability with respect to the Wenzel lawsuit.

Therefore, there is no merit to the FDIC's claim that the law firm petitioners knowingly or recklessly ignored the district court's order. In fact, at the hearing on the matter, the district court recognized that legal fees might well be paid by Capital Bank in its own defense with the secondary effect of benefiting the individual petitioners.  We thus reject the FDIC's findings and adopt those of the ALJ on this issue.

There remains the question of whether the cited Minnesota statutes were violated.  We think not.  Had indemnification occurred, the statutes would obviously have been violated because there was no special counsel as that term is defined in the statute.  But here, because the expenditures made by the law firm in defense of the Wenzel lawsuit were for the benefit of Capital

---

[17]In addition to its primary claim that the FDIC erred in interpreting the law at issue, Lindquist & Vennum claims that its right to due process of law was violated.  Because we agree that the FDIC erred in its application of the Minnesota statute, we need not reach the law firm's due process claim.

Bank, the state indemnification statutes did not become operative.  Capital Bank was not a nominal defendant, but rather it had a real interest in the outcome of the lawsuit.

The FDIC relies on Cavallari v. Comptroller of Currency, 57 F.3d 137 (2nd Cir. 1995), to support its position.  We do not believe that case is particularly helpful.  In that case, the court found that Cavallari, a lawyer, recklessly asserted that an exchange of guaranties was in the best interest of one of the parties without considering whether the exchange violated a temporary cease-and-desist order issued by the Office of Comptroller of the Currency against the bank.  Id. at 142-43.  It found that Cavallari:  (1) gave no consideration to whether an exchange of guaranties contravened the terms of the temporary cease-and-desist order of which he was aware; (2) made no effort to ascertain the actual liability exposure of the release guarantors or the worth of the alternate guaranties; and (3) was aware that an officer of the corporation, who substituted his own corporation's guaranty for the personal guaranties of friends and family members, was under investigation relating to several fraudulent transactions.  Id.  Here, the law firm petitioners reasonably decided that Capital Bank would be subject to joint and several liability if the Wenzels were successful in their lawsuit.  We therefore refuse to enforce the order of the FDIC insofar as it requires the law firm petitioners to refund to Capital Bank all of the fees it charged Capital Bank for representation in the Wenzel lawsuit.  We modify the order requiring the individual petitioners to reimburse Capital Bank for legal fees incurred in the Wenzel lawsuit to require only individual petitioners Donohoo and Mathies to reimburse Capital Bank for attorneys' fees paid solely for the counterclaims brought in the Wenzel lawsuit.

### III. CONCLUSION

For the foregoing reasons, we agree with the FDIC's findings with respect to individual petitioners in the sale and purchase of the new Capital Bank shares and petitioner Rasmussen's obligation to People's Bank. We disagree with the FDIC's findings and interpretation of law regarding the law firm petitioners' role. We disagree in part and agree in part with the FDIC's findings relating to the attorneys' fees paid in the Wenzel lawsuit. We enforce the portion of the FDIC's order that imposes penalties and prohibitions upon the individual petitioners for unsafe and unsound banking practices. We also enforce the portion requiring petitioner Rasmussen to pay the outstanding balance and interest on Loan No. 4100-29836 to People's Bank, and requiring petitioners Donohoo and Mathies to reimburse Capital Bank only for attorneys' fees associated with their counterclaims in the Wenzel lawsuit. We refuse to enforce the FDIC's order as to the law firm petitioners.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.

26